[No. 42011-2-II.    Division Two.    June 26, 2012.]

JULIE SHORT, *Appellant*, v. BATTLE GROUND SCHOOL DISTRICT
ET AL., *Respondents*.

*Judith A. Lonnquist* (of *Law Offices of Judith A. Lonnquist PS*), for appellant.

*Gerald J. Moberg* (of *Jerry J. Moberg & Associates*), for respondents.

¶1 HUNT, J. — Julie Short appeals the superior court's summary judgment dismissal of her religious discrimination, failure-to-accommodate, and retaliation claims against the Battle Ground School District and its superintendant,

Rochonne Bria. Short argues that the superior court erred in granting summary judgment because (1) she presented substantial evidence of a prima facie case for each of her claims, and (2) the parties disputed genuine issues of material fact. Holding that Short failed to meet her burden on summary judgment, we affirm.

## FACTS

### I. BACKGROUND

¶2 Julie Short is a devout Christian woman with deeply held religious beliefs. The Battle Ground School District employed Short from January 2007 through March 20, 2008. Although originally hired as the administration office receptionist, Short also worked for two and a half months as executive assistant to superintendent Rochonne Bria; in this position, Short worked closely with Bria, liked her job, and had no notable disputes with Bria.

¶3 On September 1, 2007, Bria reassigned Short to work as the assistant for Kelly O'Brien, an independent contractor who also served as the District's Public Information Officer. Although O'Brien supervised Short's day-to-day work,[1] Bria remained Short's "ultimate supervisor." Clerk's Papers (CP) at 276. Short worked closely with O'Brien for several months, planning the District's dedication ceremony for a new middle school. At some point, however, Short overheard Bria make disparaging comments about O'Brien,[2] which Short relayed to O'Brien in answer to O'Brien's questions.

---

[1] The parties appear to dispute whether O'Brien was Short's supervisor. Nevertheless, at various points in the record and/or in their briefs, both parties refer to O'Brien as Short's "supervisor" or "boss." *See, e.g.*, Clerks Papers at 2, 182; Br. of Resp't at 11 (referring to O'Brien as Short's "supervisor"). Whether O'Brien was Short's supervisor is not relevant to this appeal.

[2] Bria made the following comments in Short's presence about O'Brien: (1) "We're going to have to find you [Short] a new boss." (2) "Well it looks like [O'Brien's] gone." (3) "[O'Brien] took district property." (4) "This is a threat." CP at 182.

## A. November 26, 2007 Meeting

¶4 On November 26, Bria called Short to her office where O'Brien was seated at a conference table. Bria instructed Short to report all conversations she had relayed to O'Brien. Short tried to explain that the situation was a misunderstanding, that O'Brien was her supervisor, and that she (Short) had simply answered O'Brien's questions honestly. Short reassured Bria that she had not told O'Brien anything untrue because lying would "violate her religious beliefs." CP at 182.

¶5 According to Short, Bria then became physically threatening and intimidating—standing over Short, placing her hands on Short's shoulders, jabbing her finger in Short's face, and pacing around the office, yelling and cursing, with her arms flailing. Bria pressured Short to tell O'Brien that the information she (Short) had previously provided was untrue; but Short refused because to do so would require her to lie. Bria yelled at Short and told her to leave.

¶6 Thereafter, Bria ignored Short, refused to order supplies for her office, threatened "to take [her] to court," and told her that she (Bria) would never have another conversation with her without another adult present. CP at 69. Between November 2007 and February 2008, Short discussed her working conditions and Bria's November 26 conduct with two school board members. Short did not expressly assert that she felt she was being "discriminated against" based on her religious beliefs or that she was experiencing a "hostile work environment." CP at 72, 76. She did, however, "relate[ ]" the November 26 meeting to these board members, including how she had "explain[ed]" to Bria during that meeting that her (Short's) religious beliefs prohibited lying. CP at 78. According to Short, she did not file a formal complaint with the board members or explore more formal avenues for redress because staff involved in these procedures were "beholden" to Bria. CP at 72.

## B. February 2008 Meetings

¶7 On February 21 and February 22, 2008, Bria held a series of meetings about the new middle school dedication ceremony; Short attended these meetings with Bria's assistant, Irene Melton. During the first meeting on February 21, Bria forbade Short and Melton from discussing the meeting with anyone, especially O'Brien. Bria commented that she had personally "diagnosed" O'Brien with a "multiple personality disorder," that O'Brien had " 'eyes and ears' " all over the District office, that she (Bria) suspected someone was already on the phone informing O'Brien that they were meeting, and that Short and Melton each needed to come up with a " 'cover story' " for the meeting. CP at 64-65. When Short suggested that they "tell the truth" about the meeting, Bria did not respond. CP at 65.

¶8 According to Short, during this meeting, Bria asked her only general information about the progress of the dedication ceremony and other mundane matters, such as ordering refreshments and plaques and printing invitations. Short did not feel the information they had discussed was in any way "confidential"; but she believed the information was "vital" to O'Brien's ability to perform her job as the District's Public Information Officer. CP at 176. So when Bria told Short that she could not discuss anything that they had talked about with O'Brien, Short asked Bria if she could tell O'Brien that they had simply met to discuss the dedication ceremony; Bria responded, "[N]o." CP at 66. Short then asked if she could refer O'Brien to Bria if O'Brien had any questions; again, Bria flatly refused and said, "[N]o." CP at 66. Finally, Short asked Bria how she should respond if O'Brien asked her directly about the meeting; Bria replied, "Make something up, *lie*." CP at 62 (emphasis added).

¶9 During this meeting, Bria offered to transfer Short to another department in the District "at no loss of pay"[3] if Short cooperated with her order,[4] which Short felt was Bria's attempt "to make [her] lie *or* withhold vital information from [O'Brien]." CP at 69 (emphasis added). Short responded by telling Bria that her goal was to come to work each day, to do a good job, and to "remain *honest* and *true to [her] beliefs*." CP at 70 (emphasis added). Bria replied that Short was " 'not going to get through this and be honest' " and that she would " 'have to make a choice.' " CP at 175. When Short again refused "to lie to [her] supervisor [O'Brien]," Bria insisted that *she*, not O'Brien, was Short's supervisor and that Short should consult an organizational chart. CP at 175. According to Short, Bria did not merely tell her to " 'maintain a [District] confidence' "; instead, Bria "expressly and repeatedly direct[ed] [her] to lie to [O'Brien]," which violated Short's religious beliefs. CP at 176.

¶10 Later that day, Bria called Short back to her office and showed her a document that Short believed was a "newly created organizational chart." CP at 175. Short continued to refuse to lie to O'Brien; Bria responded by yelling at Short and threatening that her (Short's) reputation would be "ruined." CP at 175. According to Short, Bria also suggested that, if Short did not comply with her directions, she would place Short under a "hostile supervisor" for her future performance evaluations. CP at 175.

## C. March 2008

¶11 After this latter February 21 incident, Short felt Bria's conduct became "increasingly intolerable": Bria con-

---

[3] CP at 185.

[4] According to Short, Bria repeatedly told her that a transfer within the District would be possible if she (Short) could " 'get through this situation.' " CP at 187. Short perceived Bria's repeated references as improper inducement or a threat to persuade her to lie to O'Brien.

tinued to yell at Short, to threaten Short, and to give her the "silent treatment." CP at 177. Short also heard from other district employees that Bria had called her (Short) a " 'lying b\*tch' " and had told them that she (Short) was "angling for [O'Brien's] job." CP at 258. Short discussed Bria's conduct with her pastor and another parishioner at her church; she tried to work through the situation, but she was unable to do so. On March 2, Short asked to take leave because of the "treatment [she] was receiving from [Bria]." CP at 214. On March 20, while on leave, Short formally resigned.

## II. PROCEDURE

¶12 Short sued the District and Bria (collectively the District) for religious discrimination, failure to accommodate her religious beliefs, and retaliation[5] under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. The District moved for summary judgment, arguing that Short had failed to establish a prima facie case for each of her claims. The superior court granted the District summary judgment. Short appeals.

## ANALYSIS

¶13 Short argues that the superior court improperly granted summary judgment to the District because genuine issues of material fact remained in dispute and she had presented evidence sufficient to establish a prima facie case for each of her claims. We disagree.

## I. STANDARD OF REVIEW

¶14 We review summary judgment orders de novo, performing the same inquiry as the superior court. *Hisle v.*

---

[5] Although Short originally alleged wrongful discharge in violation of public policy, she later filed an amended complaint, substituting a retaliation claim for the wrongful discharge claim. Thus, this case does not involve whether Bria's direction to Short "to lie" violates public policy.

*Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Summary judgment is appropriate only if the pleadings, affidavits, depositions, interrogatories, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c); *Davis v. W. One Auto. Grp.*, 140 Wn. App. 449, 456, 166 P.3d 807 (2007). When ruling on a summary judgment motion, we consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). But where reasonable minds could reach only one conclusion from the admissible facts in evidence, summary judgment is proper. *Haubry v. Snow*, 106 Wn. App. 666, 670, 31 P.3d 1186 (2001).

██ ¶15 To defeat an employer's motion for summary judgment in an employment discrimination case, an employee "must do more than express an opinion or make conclusory statements"; she must establish "specific and material facts" to support each element of her prima facie case. *Marquis*, 130 Wn.2d at 105. Although federal employment law cases are a "source of guidance" when construing the provisions of WLAD, we bear in mind that such cases are not binding precedent and that we are free to adopt only "those theories and rationale[s] which best further the purposes and mandates of our state statute." *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988). Short has not met her burden here.

## II. Religious Discrimination and Failure-To-Accommodate Claims

█ ¶16 First, Short asserts that the superior court erred in granting summary judgment to the District and in dismissing her "religious discrimination" and religious "failure-to-accommodate" claims, which she had pleaded as

Counts I and II of her amended complaint.[6] She argues that she presented evidence sufficient to establish a prima facie case for each claim and that genuine issues of material fact remained in dispute. We disagree.

¶17 As we describe later in this opinion, Short essentially twice briefed a religious discrimination claim based on a "failure-to-accommodate" theory of liability. But our Supreme Court, our legislature, and the Washington State Human Rights Commission (HRC) have not formally recognized such a claim under WLAD. Declining to recognize such a claim in the absence of legislative or administrative recognition, we hold that the superior court did not err in dismissing Counts I and II of Short's amended complaint.

A. Scope of Claims in Counts I and II

¶18 Short purports to assert her "religious discrimination" and her religious "failure-to-accommodate" claims separately, as if they represent discrete claims under WLAD. Short relies on our Supreme Court's decision in *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 837 P.2d 618 (1992), to set forth the prima facie elements for her "religious discrimination" claim under WLAD. She then cites a federal case[7] interpreting Title VII of the Civil Rights Act of 1964 (Title VII)[8] for the prima facie elements of her WLAD religious "failure-to-accommodate" claim, and she argues that we should apply the federal legal standard to this WLAD claim because Washington courts have traditionally used federal cases as guidance when construing WLAD provisions.

---

[6] Counts I and II of Short's amended complaint alleged that the District had "discriminated against [her] because of her religious beliefs" and had "failed and/or refused to accommodate [her] religious beliefs," both in violation of RCW 49.60.180. CP at 277-78. We use the phrases "religious discrimination" and religious "failure-to-accommodate" to refer to these claims.

[7] *Lawson v. Washington*, 296 F.3d 799, 804 (9th Cir. 2002).

[8] 42 U.S.C. § 2000e.

¶19 Although the District did not originally contest Short's reliance on *Hiatt* or her ability to assert a "religious discrimination" claim under WLAD,[9] as we explain in the next section of this opinion, *Hiatt* actually involved a particular *type* of religious discrimination claim that is assertable under Title VII and which federal courts have characterized as a religious "failure-to-accommodate" claim. In essence, Short has briefed the same cause of action twice while characterizing them as separate "religious discrimination" and religious "failure-to-accommodate" claims. For purposes of this appeal, however, we consider these two claims as one.

## B. Theories of Liability for Religious Discrimination under Federal Law

¶20 Federal courts have long recognized that claims for religious discrimination under Title VII can be asserted under several different theories of liability, including disparate treatment, hostile work environment, and failure to accommodate religious beliefs. *See, e.g.*, *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603, 606 (9th Cir. 2004); *Cohen-Breen v. Gray Television Grp., Inc.*, 661 F. Supp. 2d 1158, 1167 (D. Nev. 2009).[10] Unlike federal law, however, there is sparse Washington case law analyzing the different ways that an employer might discriminate against an employee based on her religious beliefs and the various theories of liability under which a plaintiff employee can bring suit under WLAD. Thus, the primary question before us is whether our state law, WLAD, recognizes a religious dis-

---

[9] Both Short and the District originally relied on *Hiatt* to establish the prima facie elements for Short's "religious discrimination" claim, and they had agreed that *Hiatt* provided the correct legal standard for evaluating such claims under WLAD. Nevertheless, the District then contested Short's ability to assert a religious "failure-to-accommodate" claim under WLAD, again citing *Hiatt*.

[10] *See also Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996), *cert. denied*, 522 U.S. 813 (1997), and *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993) for cases more contemporaneous with *Hiatt*.

crimination claim based on a "failure-to-accommodate" theory of liability.[11]

## C. *Hiatt* Religious Discrimination Claim Based on Failure-To-Accommodate

¶21 The *Hiatt* opinion has caused some confusion for this case; and our Supreme Court has not revisited this opinion in nearly two decades. Thus, we take this opportunity to clarify the scope of claims addressed in the *Hiatt* opinion. In *Hiatt*, the Supreme Court set forth the prima facie elements and burden-shifting scheme for a particular type of religious discrimination claim based on a "failure-to-accommodate" theory of employer liability. *Hiatt*, 120 Wn.2d at 64-65. Under federal law, such claims follow a two-part burden-shifting scheme.[12] First, an employee must establish a prima facie case by producing evidence that (1) she has a bona fide religious belief that conflicts with an employment requirement, (2) she informed her employer of the conflict, and (3) she was discharged because of her refusal to comply with the requirement.[13] *Hiatt*, 120 Wn.2d at 64-65. If the employee establishes a prima facie case, the burden shifts to the employer to show that (1) it attempted in good faith to accommodate the employee's religious practices, thus discharging its statutory duty to the employee; or (2) it could not accommodate the employee's religious practices without undue hardship to its business. *Hiatt*, 120 Wn.2d at 65.

---

[11] Short did not brief her claims under either a disparate treatment or a hostile work environment theory; therefore, we do not address her claims under these theories. Nor do we consider whether WLAD recognizes these types of claims in religious discrimination actions.

[12] Federal courts have used this burden-shifting scheme almost exclusively for religious failure-to-accommodate claims. *See, e.g., Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655-56 (9th Cir. 2006) (analyzing disparate treatment claim under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), approach, a different burden-shifting scheme); *Peterson*, 35 F.3d at 606.

[13] We note that the Ninth Circuit had phrased this third element more broadly to require only that an employee show his employer " 'threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements.' " *Lawson*, 296 F.3d at 804 (quoting *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)).

¶22 The Washington Supreme Court broadly referred to the claim at issue in *Hiatt* as a "religious discrimination"[14] claim, without acknowledging the different *forms* of religious discrimination and theories of liability available to a plaintiff under Title VII. *Hiatt*, 120 Wn.2d at 61. Nevertheless, we emphasize that (1) the claim *Hiatt* addressed is properly considered a religious discrimination claim based on a failure-to-accommodate theory of liability, and (2) the *Hiatt* opinion recognized such claims *only* under federal law. *See Hiatt*, 120 Wn.2d at 61, 64.

### D. *Hiatt* Court Did Not Adopt Federal Standard

¶23 In *Hiatt* our Supreme Court had the opportunity to adopt the federal standard and to recognize a religious failure-to-accommodate claim under WLAD;[15] but it chose not to do so. *Hiatt*, 120 Wn.2d at 64. The Court noted that the religious discrimination provisions in the federal Title VII and the state WLAD were "significantly different." *Hiatt*, 120 Wn.2d at 61. In particular, Title VII expressly imposed an affirmative duty on employers to accommodate

---

[14] Our Supreme Court characterized *Hiatt*'s claim primarily as a "religious discrimination" claim; alternatively, it characterized *Hiatt*'s claim as one of "discriminatory discharge based on religion." *Hiatt*, 120 Wn.2d at 61, 64. In our view, this first characterization is too broad, and this second characterization is somewhat too narrow. Moreover, neither characterization accurately reflects the terminology used by the federal courts when analyzing such claims.

[15] Hiatt sued his employer for religious discrimination under both WLAD and Title VII after he notified his employer that his attendance and participation in a five-day training course conflicted with his religious beliefs and his employer terminated him when he stopped attending the training course. *Hiatt*, 120 Wn.2d at 59-60. Although we, too, used the blanket term "religious discrimination" to refer to the plaintiff Hiatt's state and federal law discrimination claims, we applied the legal standard that federal courts have used for Title VII religious "failure-to-accommodate" claims to both claims, and we reversed the superior court's summary judgment in favor of the employer. *Hiatt v. Walker Chevrolet Co.*, 64 Wn. App. 95, 98-100, 822 P.2d 1235, *rev'd*, 120 Wn.2d 57 (1992). The Supreme Court, however, "specifically disapprove[d]" of our assumption that WLAD provided identical protections as Title VII with respect to religious failure-to-accommodate claims. *Hiatt*, 120 Wn.2d at 64.

their employees' religious beliefs and practices, but WLAD did not contain such an explicit requirement. *Hiatt*, 120 Wn.2d at 61-62.

¶24 The *Hiatt* Court also noted that our state legislature enacted WLAD in 1949,[16] 15 years *before* Congress passed Title VII. *Hiatt*, 120 Wn.2d at 62. Congress amended Title VII in 1972 expressly to provide for religious failure-to-accommodate claims (by adding a new definition of "religion" to the statute).[17] But our state legislature and the HRC did *not* respond by similarly amending the definition of "creed"[18] in WLAD or by developing similar regulations to provide for religious failure-to-accommodate claims. *See Hiatt*, 120 Wn.2d at 62 n.2, 63.

¶25 Nevertheless, the *Hiatt* Court suggested that the existing provisions of WLAD might *implicitly* require accommodation of employees' religious beliefs and practices, noting that this was an "important and complex question" that could have "constitutional implications." *Hiatt*, 120 Wn.2d at 63. The Court then declined to address this issue of first impression under WLAD without adequate briefing from the parties. *Hiatt*, 120 Wn.2d at 64. Because our Supreme Court expressly left the question of implicit religious accommodation unanswered, we asked the parties in the instant appeal to provide supplemental briefing on this issue.

---

[16] 1949 ch. 183 § 2; REM. REV. STAT. § 7614-21 (Supp. 1949).

[17] Congress amended Title VII in 1972 to include the following definition of "religion":

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is *unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.*

*Hiatt*, 120 Wn.2d at 62-63 (emphasis added) (internal quotation marks omitted) (quoting 42 U.S.C. § 2000e(j)).

[18] RCW 49.60.030(1) prevents discrimination on the basis of one's "creed." As used in WLAD, this term has been interpreted as meaning "a system of religious beliefs." *Riste v. E. Wash. Bible Camp, Inc.*, 25 Wn. App. 299, 302, 605 P.2d 1294 (1980).

## E. No Adoption of Federal Approach Absent Legislative or HRC Action

¶26 We recognize that some states have interpreted their state antidiscrimination statutes to include an implied religious failure-to-accommodate claim, even where their statutes do not expressly impose a religious duty-to-accommodate requirement.[19] But we decline to read such a claim into WLAD without any indication from the legislature or the HRC that such a claim was originally contemplated. The same concerns that our Supreme Court recognized in *Hiatt* still exist today: Not only has our legislature not seen fit to amend WLAD to include a religious duty-to-accommodate requirement some 20 years after *Hiatt*'s publication, but also the HRC has not filled in the gaps with interpretive guidelines or regulations that might conform our state statute to the increased protections recognized under federal law.

¶27 We agree with the Wisconsin Supreme Court's analysis of the protections afforded under its state statute, which, like WLAD, was enacted before Title VII and had not been amended or interpreted to include a more recent definition of "religion" beyond the undefined term "creed," provided in the original statute:

> Despite the fact that discrimination as to creed is one of the [four] original areas of discrimination listed in the act of [1949], the legislature [and the HRC have] not found it necessary to provide further guidance in respect to an employer's obligation where arguably there is a conflict between an employee's religious practices and the employer's personnel and management procedures. . . .

---

[19] *See, e.g., Mich. Dep't of Civil Rights ex rel. Parks v. Gen. Motors Corp.*, 412 Mich. 610, 317 N.W.2d 16 (1982); *Rankins v. Comm'n on Prof'l Competence of Ducor Union Sch. Dist.*, 24 Cal. 3d 167, 593 P.2d 852, 154 Cal. Rptr. 907 (1979); *Wondzell v. Alaska Wood Prods., Inc.*, 583 P.2d 860 (Alaska 1978); *Maine Human Rights Comm'n v. Local 1361, United Paperworkers Int'l Union*, 383 A.2d 369 (Me. 1978).

We cannot conclude that the use of the undefined term, "creed," permits us to supplant or supplement the legislature's [or HRC's] prerogative[s] of determining by what means discrimination in respect to creed or religion should be suppressed or eliminated. This is a legislative [or administrative] function.

*Am. Motors Corp. v. Dep't of Indus., Labor & Human Relations*, 101 Wis. 2d 337, 348, 351, 305 N.W.2d 62 (1981), *abrogated on other grounds by Lindas v. Cady*, 150 Wis. 2d 421, 441 N.W.2d 705 (1989).

¶28 In reaching this conclusion, we acknowledge the difficult situation in which the District may have placed Short by requiring her to "lie or withhold vital information" from O'Brien. CP at 69. But because there has been virtually no legislative or administrative action clarifying the religious discrimination provisions of WLAD since its promulgation in 1949, there is little guidance for determining legislative intent in this context. Accordingly, we conclude that, where government branches tasked with establishing public policies relating to WLAD have remained silent, despite sweeping changes at the federal level, we cannot judicially promulgate legislation or administrative regulations to fill this void. Short fails to prove that there is currently a cognizable claim for religious discrimination based on a failure-to-accommodate theory under WLAD; and we decline to adopt one judicially without further guidance or action from our legislature or the HRC. Therefore, we hold that the superior court did not err in dismissing counts I and II of Short's amended complaint on summary judgment.

### III. RETALIATION CLAIM

¶29 Because Short has failed to establish a legally-recognizable religious discrimination claim based on a failure-to-accommodate theory of liability under WLAD, her only remaining claim is her retaliation claim under WLAD. She argues that the superior court erred in granting summary

judgment to the District on this claim because she presented evidence sufficient to establish a prima facie case of retaliation and the parties disputed several issues of material fact. Again, we disagree.

## A. *McDonnell Douglas*[20] Burden-Shifting Scheme

¶30 We apply the same federal *McDonnell Douglas* burden-shifting scheme to retaliation claims that our Supreme Court adopted in *Hill v. BCTI Income Fund-I*[21] for state-law discrimination claims. *Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 618, 60 P.3d 106 (2002); *Milligan v. Thompson*, 110 Wn. App. 628, 638, 42 P.3d 418 (2002). Under this burden-shifting scheme, the employee must first establish a prima facie case of retaliation. *Renz*, 114 Wn. App. at 618. If the employee fails to establish a prima facie case, then the defendant employer is entitled to summary judgment as a matter of law. *Hill*, 144 Wn.2d at 181.

¶31 If, however, the employee succeeds in establishing a prima facie case, a " 'legally mandatory, rebuttable presumption' " of retaliation temporarily takes hold, and the burden shifts to the employer to produce admissible evidence of a legitimate, nonretaliatory reason for its adverse employment action. *Hill*, 144 Wn.2d at 181 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)); *Renz*, 114 Wn. App. at 618. If the employer fails to meet its burden, the employee is entitled to an order establishing liability as a matter of law because no issue of fact remains in the case. *Hill*, 144 Wn.2d at 181-82; *Renz*, 114 Wn. App. at 618.

¶32 If the employer provides such legitimate nonretaliatory reason, then the burden shifts back to the employee to show that the employer's reason is actually pretext for what, in fact, was a retaliatory purpose for its

---

[20] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[21] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006).

adverse employment action. *Grimwood*, 110 Wn.2d at 364; *Renz*, 114 Wn. App. at 618-19. If the employee fails to make this showing, however, the employer is entitled to judgment as a matter of law. *Hill*, 144 Wn.2d at 182; *Renz*, 114 Wn. App. at 619.

## B. No Prima Facie Case

█ ¶33 WLAD forbids an employer to discharge or otherwise to discriminate against an employee in retaliation for her "oppos[ing] any practices forbidden by this chapter" or for filing a charge, testifying, or assisting in a discrimination proceeding. RCW 49.60.210(1); *Milligan*, 110 Wn. App. at 638. To establish a prima facie case of retaliation, an employee must show that (1) she engaged in a statutorily protected activity, (2) her employer took adverse employment action against her, and (3) there is a causal link between the activity and the adverse action. *Milligan*, 110 Wn. App. at 638.

¶34 The District contends that Short's retaliation claim is "meritless" because she did not engage in a statutorily protected activity, and she did not suffer any adverse employment action. Br. of Resp't at 15. We agree with the District's latter argument.

### 1. Statutorily protected activity

█ ¶35 To prove a statutorily protected activity, it is not necessary that the employer's challenged conduct be unlawful. *Renz*, 114 Wn. App. at 619. " '[A]n employee who opposes employment practices *reasonably believed to be discriminatory* is protected by the 'opposition clause' whether or not the practice is actually discriminatory.' " *Renz*, 114 Wn. App. at 619 (emphasis added) (internal quotation marks omitted) (quoting *Graves v. Dep't of Game*, 76 Wn. App. 705, 712, 887 P.2d 424 (1994)). Thus, Short's inability to prove her religious discrimination claim based on a failure-to-accom-

modate theory is not dispositive of her retaliation claim. Instead, she can recover on her retaliation claim as long as she reasonably believed that the District's conduct violated the law. *See Renz*, 114 Wn. App. at 619; *see also Ellis v. City of Seattle*, 142 Wn.2d 450, 460, 13 P.3d 1065 (2000) (requiring only an "objectively reasonable belief").

■ ¶36 Washington courts have also concluded that employee complaints to a supervisor may constitute a statutorily protected activity. *See, e.g., Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn. App. 774, 798-99, 120 P.3d 579 (2005). Thus, we assume, without deciding, that for purposes of this appeal, Short engaged in a statutorily protected activity when she informed Bria that she would not lie or withhold vital information from O'Brien in violation of her religious beliefs.

### 2. Adverse employment action

■ ¶37 Because Short has failed to show that she was constructively discharged, she has failed to meet her burden of establishing an adverse employment action. A constructive discharge occurs "where an employer deliberately makes an employee's working conditions intolerable, thereby forcing the employee to resign." *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996). Courts have applied this doctrine where an employer has allegedly engaged in illegal discrimination or retaliation for protected conduct. *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 632-33, 700 P.2d 338 (1985).

■ ¶38 To establish constructive discharge, an employee must show (1) a deliberate act by the employer that made her working conditions so intolerable that a reasonable person in her shoes would have felt compelled to resign, and (2) that she resigned because of her working conditions and not for some other reason. *Nielson v. AgriNorthwest*, 95 Wn. App. 571, 578, 977 P.2d 613 (1999); *Washington v. Boeing Co.*, 105 Wn. App. 1, 15, 19 P.3d 1041

(2000). Whether working conditions have risen to an "intolerable" level is generally a factual question for the jury, unless there is no competent evidence to establish a claim of constructive discharge. *Haubry*, 106 Wn. App. at 677; *see also Sneed*, 80 Wn. App. at 849. Courts "usually look for evidence of either 'aggravating circumstances' or a 'continuous pattern of discriminatory treatment' to support a constructive discharge claim." *Sneed*, 80 Wn. App. at 850 (quoting *Wunderly v. S.C. Johnson & Son, Inc.*, 828 F. Supp. 801, 806 (D. Or. 1993)). But "[a] resignation is presumed to be voluntary, and the employee must introduce evidence to rebut that presumption." *Washington*, 105 Wn. App. at 16.

¶39 Short cannot support a constructive discharge claim because she has failed to demonstrate sufficient "aggravating circumstances" or a "continuous pattern of discriminatory treatment" that occurred *after* her opposition activity (refusing Bria's direction to lie or to withhold information from O'Brien during the February 2008 meetings).[22] The meetings during which Bria allegedly directed Short to lie and may have also engaged in deliberate acts to incite Short's constructive discharge took place over a short, two-day period (February 21 and February 22). Short took leave on March 2 and resigned almost immediately thereafter.[23]

¶40 To prove the events that occurred during or after the February 2008 meetings, which constituted the relevant time period for Short's constructive discharge claim, Short produced evidence that Bria may have (1) offered Short a transfer within the District "at no loss of pay," (2) yelled at

---

[22] Although Short also introduced evidence that Bria engaged in intimidating and threatening behavior in November 2007, she did not show that this conduct was causally related to her (Short's) opposition activity in February 2008. We, therefore, have not considered it as part of her retaliation claim here, even though it may have been relevant to her constructive discharge argument as it related to her religious "failure-to-accommodate" claim.

[23] We also note that February 21 and 22 fell on a Thursday and Friday in 2008, and there were only five work days between the latter February 22 meeting and Short's going on leave on March 2.

Short and threatened that her reputation would be "ruined," (3) threatened to place her under a "hostile supervisor," and (4) told other employees that Short was a "lying b*tch" and that she was "angling for [O'Brien's] job." CP at 175, 185, 258. With the exception of Bria's latter statements made to third party employees, the remainder of this offensive conduct occurred on a single day—February 21.

¶41 For purposes of summary judgment, we take the evidence in the light most favorable to Short and assume that Bria engaged in the hostile conduct that Short asserts. But because this conduct occurred over such a short time period, this evidence does not rise to a level that a reasonable person would consider "intolerable." For example, an employee's frustration, and even direct or indirect negative remarks, are not enough to show intolerable working conditions. *Crownover v. Dep't of Transp.*, 165 Wn. App. 131, 149, 265 P.3d 971 (2011), *review denied*, 173 Wn.2d 1030 (2012). Similarly, the Ninth Circuit has recognized that a " 'single isolated instance' " of discrimination is generally insufficient as a matter of law to support a finding of constructive discharge. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (quoting *Nolan v. Cleland*, 686 F.2d 806, 813 (9th Cir. 1982)). Treating single acts or very short periods of hostility as insufficient to establish constructive discharge is consistent with the principle that our antidiscrimination law policies are best served when the parties attempt to remediate discrimination while continuing in their existing employment relationships, if possible. *See Watson*, 823 F.2d at 361.

¶42 We find the Ninth Circuit's reasoning persuasive here. Because Short did not introduce evidence of aggravating circumstances or a pattern of discriminatory treatment after the February 2008 meetings, she has failed to establish an adverse employment action by constructive discharge. Accordingly, we hold that the superior court did not

err in granting the District summary judgment and dismissing Short's retaliation claim.

¶43 We affirm.

WORSWICK, C.J., and QUINN-BRINTNALL, J., concur.

Reconsideration denied September 6, 2012.