FILED
COURT OF APPEALS
DIVISION II

2014 APR 29 AM 8: 45

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PETER and RACHEL ATKINSON, husband and wife, and the marital community composed thereof, | No. 44326-1-II |
| Appellants, | |
| v. | |
| LES SCHWAB TIRE CENTERS OF WASHINGTON, INC., a Washington corporation, | UNPUBLISHED OPINION |
| Respondent, | |
| CIGNA HEALTHCARE, INC., a foreign corporation, | |
| Defendant. | |

JOHANSON, J. — Peter Atkinson[1] sued his employer, Les Schwab Tire Centers of Washington, Inc. (Les Schwab), for disability discrimination after the company terminated his employment. Atkinson appeals the trial court's grant of summary dismissal of his claims. He argues that he produced evidence sufficient to establish prima facie discrimination claims for (1) disparate treatment, (2) hostile work environment, (3) unlawful retaliation, and (4) failure to provide reasonable accommodation. He further argues that the trial court abused its discretion in denying his motion to impose sanctions and that the trial court erred in striking certain

---

[1] Peter and Rachael Atkinson brought suit against Les Schwab as a marital community; we use "Atkinson" to identify Peter Atkinson.

No. 44326-1-II

declarations. Viewing the record in a light most favorable to Atkinson as the nonmoving party, we hold that Atkinson failed to carry the necessary burden for each of his claims and, thus, we affirm the trial court's summary judgment order in favor of Les Schwab.

FACTS

Atkinson has suffered from complex hereditary migraine headaches since childhood.[2] These migraine headaches cause pain, nausea, fatigue, and cognitive functioning difficulty. Shortly after his high school graduation in 1996, Atkinson accepted a position with Les Schwab in the "sales and service" department located in Longview.

In 2003, Rory Cox, store manager of Les Schwab's Chehalis location, hired Atkinson to serve as his second assistant manager. During his interview, Atkinson informed Rory[3] that he experienced chronic migraines. Atkinson's promotion to second assistant manager meant that he had additional responsibilities requiring greater flexibility and longer hours, typically 70 to 80 a week. Atkinson claimed that the additional hours contributed to the frequency and severity of his migraines.

In April 2006, Rory promoted Atkinson to first assistant manager of the Chehalis location. Accepting the role of first assistant manager meant that Atkinson's schedule became more demanding because he had to perform a central role in the day-to-day operations of the branch. According to Rory, Atkinson's decrease in performance and lack of motivation became increasingly evident as his work load grew.

_____

[2] "Complex hereditary migraine headaches" and "intractable migraine headaches" appear to be used interchangeably. The record does not clearly indicate which, if either, is an actual diagnosis or simply medical terminology used to describe migraines that do not respond effectively to treatment.

[3] The first name of Rory Cox is used for clarity and to distinguish him from Doug Cox.

2

Atkinson believed that he could do his job as first assistant manager without concern for his migraine symptoms approximately 80 to 90 percent of the time. The remaining time, when he felt that his condition was too much to bear, Atkinson would either miss work, require time sitting in the break room, or, on rare occasions, leave for the remainder of the day. Other times during migraine symptoms, Atkinson would continue working, but would do so at a "lesser capacity" because of his discomfort.

Shortly after Atkinson was promoted to first assistant manager, his persistent migraines became the focal point of a conversation between Atkinson, Rory, and Mike Palin.[4] Atkinson claimed that Rory told Atkinson that "[he] need[s] to get [his] migraines taken care of or . . . look for work elsewhere." 3 Clerk's Papers (CP) at 446. This exchange prompted Atkinson to draft an e-mail to Ray Compton and John Britton[5] titled "Career Advice." 1 CP at 134. In the body of the e-mail, Atkinson stated that "[he has] now been advised to explore other career options, whether something different in the company or different altogether, if [his] migraine condition doesn't improve." 1 CP at 134.

The following day, Atkinson received a call from Britton assuring him that his medical condition would not affect his mobility within the company. Britton advised Atkinson to continue to move forward in his capacity as assistant manager. The e-mail was apparently forwarded to Doug Cox, one of the zone managers for Les Schwab, who told Rory that Atkinson's migraines "were a medical issue [and] they were not to be brought up in the context

---

[4] Palin became the new second assistant manager when Atkinson was promoted from that role in 2006.

[5] Compton was the district manager at the time of the 2006 e-mail. The record is not clear as to what role Britton occupied for Les Schwab.

3

of the job." 3 CP at 525. Atkinson believed the e-mail began the souring of his relationship with Rory and that "[Rory] wanted to get back at [Atkinson] for that" because Atkinson "went, in a sense, above [Rory's] head to people in [the] main office." 1 CP at 127.

In late 2007, Atkinson applied to the "manager's list," which allowed him to be considered for a store manager position by appearing and interviewing in front of a management review board. 1 CP at 87. Desiring the endorsement of a current manager before applying for the list, Atkinson sought and obtained the support of Rory, among others.

In January 2008, Atkinson interviewed before the management review panel. Following that interview, Atkinson was not added to the manager's list. Shortly thereafter, two members of the review board, Gary Wanderschied and George Saddler, met with Atkinson and Rory to discuss portions of Atkinson's interview. Specifically, they discussed negative feedback from the peer review portion, the need for increased physical output and improved communication from Atkinson, in addition to the fact that his crew members accused him of disappearing from time to time or "hiding." 2 CP at 199.

Over the course of the next year, Atkinson received a series of poor performance reviews. In December 2008, Atkinson had a meeting with Rory during which Rory conveyed certain performance concerns along with those expressed by Atkinson's crew personnel. But Atkinson believed that the difficulties he experienced towards the end of his employment with Les Schwab emerged as a result of his 2006 e-mail and the subsequent deterioration of his relationship with Rory.

Atkinson maintained that Rory often undermined his authority to other managers and would "work things in a way that got the crew mad at [him]." 1 CP at 128. Atkinson complained that Rory would tell other employees that Atkinson was "hiding out" in the

4

bathroom and that he "didn't want to be . . . part of the work" when he was actually vomiting from illness. 3 CP at 490, 493. Atkinson stated that a former co-worker mentioned that Rory "just had it out for [Atkinson]." 3 CP at 493. Atkinson also complained that Palin and other members of the crew made insulting comments that belittled his condition.[6] Atkinson claimed that his work environment became uncomfortable because of the apparent animosity the other managers developed toward his condition.

In January 2009, Rory e-mailed a list of concerns regarding Atkinson's performance to Greg L'Hommedieu, one of Les Schwab's area managers. L'Hommedieu and Rory met with Atkinson following the e-mail exchange to discuss where his performance as assistant manager was lacking. L'Hommedieu reportedly warned Atkinson that failure to improve performance promptly would result in his removal as assistant manager. In March 2009, when Atkinson's performance had not improved satisfactorily, Atkinson was "removed from his position"[7] as assistant manager. 2 CP at 192.

Following his removal as assistant manager, Atkinson applied for and began to receive disability benefits through the Social Security Administration (SSA). Atkinson also met with Dr. Elena Robinson after his termination. Dr. Robinson concluded that Atkinson was unable to work in any capacity, including light duty, and that Atkinson could not perform the essential functions of his job.

---

[6] Atkinson stated that Palin disparaged him by referring to his migraines as "another little headache." 1 CP at 97.

[7] This process involves removal from a managerial role but does not fully terminate employment until 30 days elapse.

Atkinson contended that he could have been more effective in his role as first assistant manager had Les Schwab allowed him certain accommodations. In Atkinson's view, he would have been able to continue working as first assistant manager if his hours had been reduced, if consistent, uninterrupted lunches were scheduled, and if he were provided the flexibility to take breaks whenever he needed reprieve from his migraines.[8] But according to Rory, the Chehalis store's fast pace and high sales volume meant that the management team's presence was essential and that they were unable to enjoy the luxury of regular, uninterrupted breaks and short hours.

Atkinson filed a complaint against Les Schwab under the Washington Law Against Discrimination (WLAD)[9] for disparate treatment, failure to provide reasonable accommodation, and unlawful retaliation. Les Schwab moved for summary judgment on all claims. The trial court found no genuine issue as to any material fact and granted Les Schwab's motion for summary judgment. Atkinson appeals.

ANALYSIS

We review summary judgment orders de novo, viewing the facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Trial courts properly grant summary judgment where the pleadings and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). To defeat an employer's motion for summary judgment

---

[8] When asked whether he ever told Rory that a short lunch break would help alleviate some of the pain during migraines, Atkinson said, "I believe I did . . . three or four times" and that he recalls being told that he should work through it; but Atkinson cannot remember when he brought this up. 3 CP at 446.

[9] Ch. 49.60 RCW.

6

in an employment discrimination case, an employee must do more than express an opinion or make conclusory statements; the employee must establish specific and material facts to support each element of a prima facie case. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996).

## DISPARATE TREATMENT

Atkinson contends that summary judgment in favor of Les Schwab was improper because he established a prima facie disparate treatment claim. Specifically, he argues that he has direct evidence of discriminatory intent or, in the alternative, that he meets the *McDonnell Douglas*[10] burden-shifting test. Viewing the evidence in a light most favorable to Atkinson, we hold that Atkinson failed to produce sufficient evidence that discriminatory intent was a substantial factor in his termination under the direct evidence test. We hold further that Atkinson failed to produce sufficient evidence of pretext under the *McDonnell Douglas* test. Therefore, the trial court properly granted Les Schwab summary judgment on Atkinson's disparate treatment claims.

## A. RULES OF LAW

Disparate treatment occurs when an employer treats some people less favorably than others because of race, color, religion, sex, or other protected status.[11] *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 354 n.7, 172 P.3d 688 (2007). Disability discrimination can give rise to a disparate treatment claim. *McClarty v. Totem Elec.*, 157 Wn.2d 214, 222, 137 P.3d 844

---

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[11] Disability is a protected status. RCW 49.60.180(3).

(2006).[12] A plaintiff may establish a prima facie case by either offering direct evidence of an employer's discriminatory intent, or, when a plaintiff lacks direct evidence, by satisfying the *McDonnell Douglas* burden-shifting test that gives rise to an inference of discrimination. *Kastanis v. Educ. Emps. Credit Union*, 122 Wn.2d 483, 491, 859 P.2d 26, 865 P.2d 507 (1993).

## B. DIRECT EVIDENCE TEST

Under the direct evidence test, a plaintiff can establish a prima facie case by providing direct evidence that the defendant employer acted with a discriminatory motive in taking an adverse employment action against an employee with a protected status. *Kastanis*, 122 Wn.2d at 491. A plaintiff must also establish that the discriminatory motivation was a "'significant or substantial factor in an employment decision.'" *Kastanis*, 122 Wn.2d at 491 (quoting *Buckley v. Hosp. Corp. of Am., Inc.*, 758 F.2d 1525, 1530 (11th Cir. 1985)).

We generally consider an employer's discriminatory remarks to be direct evidence of discrimination. *See Johnson v. Express Rent & Own, Inc.*, 113 Wn. App. 858, 862, 56 P.3d 567 (2002) (reversing summary judgment for employer based on supervisor's ageist comments that plaintiff did not fit company's image of "a youthful, fit, 'GQ' looking mold").

Here, to satisfy the direct evidence test, Atkinson must demonstrate that Les Schwab acted with a discriminatory motive, and that the discriminatory motive was a significant or substantial factor in taking an adverse employment action against him based on his protected disability status. Atkinson easily satisfies the adverse employment action prong. He was discharged from his position, which is the ultimate adverse employment action. In addition,

---

[12] *McClarty, Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 23 P.3d 440 (2001), and *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 70 P.3d 126 (2003), utilize a definition of "disability" that has since been superseded by statute. RCW 49.60.040(7). But these cases remain good law for the propositions for which we cite them.

Atkinson presented direct evidence of discriminatory motive in Rory's comment that "[he] need[s] to get [his] migraines under control or find work elsewhere." 1 CP at 84.

Although a significant amount of time passed between Rory's comment and Atkinson's termination, we assume, without deciding, that a statement of this nature constitutes direct evidence of discrimination when viewed in a light most favorable to Atkinson. But even assuming that Atkinson established that Rory's comment was direct evidence of discrimination, his disparate treatment claim still fails under the direct evidence test because he cannot produce sufficient evidence that the discriminatory motive was a substantial factor in his termination.

Atkinson contends that animosity existed between himself and his superiors because of his condition, especially after he sent the 2006 e-mail. He asserts that his termination nearly three years later was the culmination of a deteriorated relationship. In response to Les Schwab's assertion that Atkinson's inconsistent performance was the reason for his termination, Atkinson claims that disciplinary action for performance-related issues does not make sense because he had the consent and support of several of the area managers to appear before the management review board. In his view, Atkinson's performance "was good enough to run a multimillion dollar store." 1 CP at 88.

But Atkinson's subjective opinion does not establish that his medical condition was a substantial factor in his discharge[13] and several of Atkinson's reviews indicate performance concerns as the sole factor that motivated Les Schwab's decision. In March 2008, Atkinson's

---

[13] *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (stating that mere assertion that defendant had discriminatory motivation and intent is inadequate to preclude summary judgment); *see also Chen v. State*, 86 Wn. App. 183, 191, 937 P.2d 612 (An employee's assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of discrimination.), *review denied*, 133 Wn.2d 1020 (1997).

performance review suggested that his commitment to the store, his ability to work cooperatively with customers and co-workers, and his ability to balance his workload in a "rapid pace" environment needed improvement. 2 CP at 203. Atkinson's review in July 2008 mentioned subpar communication skills and the need for development as a crew leader.

In a December 2008 meeting, Rory told Atkinson that a "quantum leap" in job performance was necessary. 2 CP at 210. Also, in 2008, neutral members of the management review board traveled from Portland, Oregon to Chehalis specifically to meet with Atkinson to discuss ways he could improve in certain areas before he next interviewed for the list, including management skills and issues mentioned in negative reviews from his crew members.

Moreover, it was Rory who both hired Atkinson and played an integral, if not the primary, role in the decision to remove him. When someone is both hired and fired by the same decision makers within a relatively short period of time, there is a strong inference that he or she was not discharged because of any attribute the decision makers were aware of at the time of the hiring.[14] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 189, 23 P.3d 440 (2001) (*citing Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996)). Here, Atkinson was hired by Rory in 2003, promoted by Rory in 2006, and fired by Rory in 2009. Atkinson made it clear that Rory was aware of Atkinson's condition when he was initially hired.

Atkinson does not show that Les Schwab's alleged discriminatory motive was a substantial factor in the decision to terminate his employment. Atkinson's burden under RCW 49.60.180 is to present evidence sufficient for a trier of fact to reasonably conclude that the

---

[14] *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) ("[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.").

alleged unlawfully discriminatory animus was more likely than not a substantial factor in the adverse employment action. *Hill*, 144 Wn.2d at 186-87. Atkinson's inability to demonstrate that discrimination against his disability was a substantial factor leading to his termination fails to create any genuine issue of material fact sufficient to reverse the trial court's summary dismissal of his claim. Accordingly, Atkinson fails to establish a prima facie case of disparate treatment under the direct evidence test.

## C. *McDonnell Douglas* Test

In the alternative, Atkinson argues that he satisfied the *McDonnell Douglas* burden-shifting test. Atkinson contends that any reason for his termination offered by Les Schwab was a pretext. Though Atkinson may be able to establish the elements of a prima facie case under the *McDonnell Douglas* burden-shifting test, his disparate treatment claim fails because he cannot demonstrate that Les Schwab's articulated reasons for Atkinson's termination were pretext.

Under the *McDonnell Douglas* test, a plaintiff establishes a prima facie case if he presents evidence that (1) he belongs to a protected class; (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, nonprotected employee; and (4) he and the nonprotected "comparator" were doing substantially the same work. *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 227, 907 P.2d 1223 (1996).

If the plaintiff establishes his prima facie case under *McDonnell Douglas*, then a legally mandatory, rebuttable presumption of discrimination temporarily takes hold, and the evidentiary burden shifts to the defendant to produce admissible evidence of a legitimate, nondiscriminatory explanation for the adverse employment action sufficient to raise a genuine issue of fact as to whether the defendant discriminated against the plaintiff. *Hegwine*, 162 Wn.2d at 354. If the employer meets this intermediate production burden, the presumption established by having the

11

prima facie evidence is rebutted and the presumption simply drops out of the picture. *Hegwine*, 162 Wn.2d at 354. Once the presumption is removed, the plaintiff is then afforded a fair opportunity to show the defendant's stated reason for the adverse action was in fact a pretext. *Hegwine*, 162 Wn.2d at 354. If a plaintiff cannot present evidence that the defendant's reasons for the adverse employment action are untrue or pretext, summary judgment is proper. *Domingo v. Boeing Emps.' Credit Union*, 124 Wn. App. 71, 78, 98 P.3d 1222 (2004).

Even assuming, without deciding, that Atkinson has established a disparate treatment prima facie case under the *McDonnell Douglas* test, his claim fails because he is unable to demonstrate that Les Schwab's proffered reasons for his termination were pretext and this failure is fatal to his claim.

To prove pretext, a plaintiff must show that the defendant's articulated reasons (1) had no basis in fact, (2) were not really motivating factors for its decision, (3) were not temporally connected to the adverse employment action, or (4) were not motivating factors in employment decisions for other employees in the same circumstances. *Fulton v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 137, 161, 279 P.3d 500 (2012). To meet this burden, the employee is not required to produce evidence beyond that already offered to establish a prima facie case or direct "smoking gun" evidence. *Sellsted v. Wash. Mut. Sav. Bank*, 69 Wn. App. 852, 860, 851 P.2d 716, *review denied*, 122 Wn.2d 1018 (1993).

A court may grant summary judgment when the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred. *Milligan v. Thompson*, 110 Wn. App. 628, 637, 42 P.3d 418 (2002). Thus, the trial court should submit the case to a

jury only when it determines that all three facets of this burden-shifting scheme are met and that the parties have produced sufficient evidence supporting reasonable but competing inferences of both discrimination and nondiscrimination. *Fulton*, 169 Wn. App. at 149.

Under these facts, our analysis of the pretext issue under *McDonnell Douglas* will depend on substantially the same evidence as the "substantial factor" analysis above. Assuming that the burden did shift to Les Schwab to articulate a nondiscriminatory reason for its decision to discharge Atkinson, it has done so with a lengthy and detailed list of performance concerns. The burden then shifts back to Atkinson to show that the reasons are mere pretext for a discriminatory purpose, and if he cannot, summary judgment for Les Schwab is appropriate. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 364, 753 P.2d 517 (1988).

Our Supreme Court's pretext analysis in *Grimwood* is illustrative. There, the plaintiff worked as the director of food services for the University of Puget Sound (UPS). *Grimwood*, 110 Wn.2d at 356. Following his termination, Grimwood alleged age discrimination, but UPS contended that serious performance issues were the actual reason. *Grimwood*, 110 Wn.2d at 357. In support of his position, Grimwood offered letters from users of his services expressing satisfaction with the same. *Grimwood*, 110 Wn.2d at 364. But the court stated that these letters were insufficient to overcome the reasons articulated by UPS for Grimwood's termination because the letters did not come from anyone charged with evaluation of his performance whereas UPS supported its own reasons with statements from individuals who did evaluate and supervise Grimwood. *Grimwood*, 110 Wn.2d at 365.

Moreover, the court found that the employer's reasons for discharging plaintiff were bolstered by the fact that there were written complaints long before plaintiff's termination and by the fact that some complaints about his performance came from those under plaintiff's

supervision rather than someone with authority to discharge. *Grimwood*, 110 Wn.2d at 365. UPS had also warned Grimwood six months before his termination that continued substandard performance in the designated areas would be cause for dismissal. *Grimwood*, 110 Wn.2d at 365. The employer called Grimwood's job deficiencies to his attention in writing, suggested ways he could improve his performance, and expressed a willingness to assist him in correcting the problems. *Grimwood*, 110 Wn.2d at 364-65.

Here, in addition to his own opinion, Atkinson offers declarations that either support his performance or question Les Schwab's motivation for removing him. But like *Grimwood*, none came from anyone having supervisory power. Instead, these declarations were from family members and a former co-worker.

Furthermore, as mentioned above, Les Schwab presented evidence establishing that it had well-documented concerns regarding Atkinson's performance. These issues were documented in performance reviews, meeting notes, and e-mails. They were expressed by store managers, area managers, and members of a promotion review board. Some of these documents indicate performance concerns expressed by employees under Atkinson's supervision, who had no authority to discharge him.

Atkinson fails to establish that Les Schwab's reasons for terminating Atkinson's employment had no basis in fact or were not really motivating factors in the ultimate decision. Even when the evidence is viewed in a light most favorable to Atkinson, Les Schwab presented abundant and uncontroverted evidence that no discrimination occurred, and Atkinson's evidence is too weak to establish that the reasons offered by Les Schwab were mere pretext. Accordingly, Atkinson's disparate treatment claims fail, and summary judgment was therefore appropriate on this claim.

ACCOMMODATION

Atkinson next argues that Les Schwab failed to reasonably accommodate his medical needs. He does not assert that he requested and was subsequently denied accommodations; rather, he contends that certain accommodations had been offered since the beginning of his employment with Les Schwab and that Rory began to withdraw those accommodations. Les Schwab responds that Atkinson cannot retroactively request accommodations and that if the law did allow such a request, the accommodations he sought were unreasonable because they are essential functions of his position.[15] Viewing the evidence in a light most favorable to Atkinson, we hold that he failed to produce evidence sufficient to establish a prima facie case that Les Schwab failed to offer reasonable accommodations because the accommodations Atkinson desired would have altered essential functions of Atkinson's position. Therefore, summary judgment was properly granted in favor of Les Schwab on this claim.

A. RULES OF LAW

Our high court has laid out four elements that an employee must show to establish a prima facie case of failure to reasonably accommodate a disability: (1) the employee has a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial

---

[15] Les Schwab also argues in its brief that Atkinson did not engage in the "interactive process" which is the terminology our courts use to describe the communication that must occur between the employer and the employee so that the employer remains reasonably apprised as to the employee's accommodation needs. While Les Schwab is likely correct that this failure would defeat Atkinson's accommodation claim, each party devotes more focus to the issues set forth in the analysis below. We do not address whether Atkinson failed to engage in the interactive process because his accommodation claim is fatally flawed on other grounds.

limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004). Our analysis focuses primarily on the second element—the essential functions of the job.

## B. ESSENTIAL FUNCTION

An employer is not required to offer accommodations that alter the essential functions or fundamental job duties of a given position. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 534, 70 P.3d 126 (2003). In *Davis*, a systems engineer sued his former employer for failing to reasonably accommodate him when various medical issues required him to reduce his hours and workload drastically. 149 Wn.2d at 527. As a systems engineer, Davis was regularly required to work over 50 hours a week, sometimes between 60 to 80 hours when new products were launched. *Davis*, 149 Wn.2d at 526.

The court in *Davis* affirmed a grant of summary judgment in favor of Microsoft noting that the varying hour requirements, the frequent travel, and the unpredictable customer demands, taken together, constituted an essential function of Davis's position. 149 Wn.2d at 526. This case and *Davis* are factually similar in some key respects. Here, Atkinson felt that extended hours and inconsistent breaks exacerbated his migraine symptoms. Atkinson claims that he could have been accommodated fairly if his work hours were reduced to 40 or 50, a level similar to those he worked in the "sales and service" position. Atkinson also felt that Les Schwab should allow him the flexibility necessary to take breaks and uninterrupted lunches when he experienced migraines. But long hours, changing conditions, and availability to handle issues that arise unexpectedly are key aspects of a managerial role. The Chehalis Les Schwab averaged more than five million dollars in sales annually. To handle this volume, there were nearly 30

16

employees and only 3 managers at any given time. The management team was expected to be at the location before the hourly employees and to stay later. The luxury of completely uninterrupted breaks was not available to managers as it may have been for others.

By his own admission, Atkinson never knew whether he did or did not need additional flexibility to take breaks because of the sudden onset of his migraines. It appears that Atkinson desired the slower pace of his "sales and service" job but with the higher compensation of the assistant manager position. Atkinson was well compensated[16] during his employment and it was reasonable for Les Schwab to expect longer hours from salaried managers than they would hourly employees. Atkinson's desired accommodations would have required Les Schwab to alter essential functions of his position. This is a result that the law neither intends nor requires. The trial court did not err in granting summary judgment in favor of Les Schwab on Atkinson's accommodation claim.

## C. APPLICATION OF CLEVELAND V. POLICY MANAGEMENT SYSTEMS CORP.

Atkinson also claims that the trial court granted summary judgment in favor of Les Schwab on Atkinson's accommodation claim largely because Atkinson claimed total disability on his application for disability benefits under the SSA. According to Atkinson, Cleveland[17] precludes summary judgment on these grounds. Les Schwab argues that Atkinson's claim of total disability for the purpose of SSA benefits was diametrically opposed to his assertion that he could perform the essential functions of his job with reasonable accommodations. Because Atkinson offered no explanation to resolve the inconsistency between his SSA disability

---

[16] Atkinson made nearly $115,000 in his last year with Les Schwab.

[17] *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999).

application and his current accommodation claim, his argument that *Cleveland* precludes summary judgment fails.

The Court in *Cleveland* determined that claims for Social Security Disability Insurance (SSDI) under the Social Security Act[18] (SSA) and for damages under the Americans with Disabilities Act[19] (ADA) do not inherently conflict to the point that receipt of SSDI benefits estops the recipient from pursuing an ADA claim. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-03, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999).[20] The Court explained that the confusion derives from the fact that the ADA requires that an individual maintain the ability to perform essential functions of her job, at least with reasonable accommodation, while eligibility for SSDI benefits is reserved for those having disabilities so severe that they are "'unable to do [their] previous work'" and "'cannot . . . engage in any other kind of substantial gainful work which exists in the national economy.'" *Cleveland*, 526 U.S. at 797 (alteration in original) (quoting 42 U.S.C. § 423(d)(2)(A)).

The court reconciled the seemingly divergent provisions by characterizing the total disability necessary for SSDI benefits as "often impl[ying] a context-related legal conclusion." *Cleveland*, 526 U.S. at 802. In effect, a person can be considered legally disabled for the purpose of the SSA while perhaps able to work if offered the kind of reasonable accommodations that the SSA does not take into account. *Cleveland*, 526 U.S. at 802-03.

---

[18] 42 U.S.C.A. § 423(d)(2)(A).

[19] 42 U.S.C.A § 12111(8).

[20] The ADA is the federal counterpart to WLAD. *See Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 118, 720 P.2d 793 (1986) (stating that Washington courts look to federal discrimination law in interpreting the WLAD).

Atkinson is correct that his application for (and subsequent receipt of) SSDI benefits in and of itself does not constitute appropriate grounds for summary dismissal of his WLAD claims nor does it estop him from seeking money damages. But Atkinson's accommodation argument is flawed for two reasons: (1) he fails to explain the contradiction between his SSDI application and his WLAD claims as *Cleveland* requires, 526 U.S. at 806; and (2) days after his termination, Atkinson's doctor made several additional statements that described the extent of Atkinson's condition and his inability to work.

The *Cleveland* Court held that although an ADA plaintiff is not estopped from seeking damages after receiving SSDI benefits, he or she cannot simply ignore the apparent contradiction arising out of the earlier claim of total disability. 526 U.S. at 806. A discrimination plaintiff must proffer a sufficient explanation as to the inconsistencies and if they fail to do so, prior assertions of inability to work in the earlier application will appear to negate essential elements of ADA claims, rendering summary judgment appropriate.[21]

In his application for SSDI benefits, Atkinson describes himself as being completely bedridden by the severe pain associated with his migraines. Atkinson mentions that his job duties required him to run, walk, climb, and lift for approximately five to seven hours a day. Atkinson then claims that he cannot walk, drive, lift objects, or interact with others during migraines, and that he was unable to work beginning on March 6, 2009. On March 18, 2009, 12 days after Atkinson was removed from his position, Atkinson's doctor, Dr. Robinson, filled out a medical certification form on which she answered several questions about Atkinson's condition

---

[21] "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case.'" *Cleveland*, 526 U.S. at 806 (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

and the work-related limitations it creates. She answered "no" to the question inquiring as to whether Atkinson was able to perform work of any kind, including light duty tasks. 1 CP at 180. She also answered "[n]o" when asked whether Atkinson could perform one or more of the essential functions of his job. 1 CP at 180.

In early June 2009, Atkinson saw Dr. Robinson again who concluded their meeting with a report stating that Atkinson's condition had not improved and that she recommended that Atkinson not return to work.

Atkinson has made no attempt to explain the contradictory nature of his previous statements or to resolve the disparities between those statements and his current belief that he can perform the essential functions of his former job. Atkinson submitted a declaration by Merrill Cohen, who claimed to have a "vocational rehabilitation practice" and who served regularly as a "vocational expert" in disability adjudications before administrative law judges. 4 CP at 762. The essential premise of Cohen's declaration is that applications for various benefits by unemployed workers often require conclusory statements that appear mutually exclusive but actually are not.

But Cohen is describing the relationship between Atkinson's application for emergency unemployment benefits and Atkinson's need for accommodation. Cohen addresses the fact that Atkinson indicated that he was fully able to work on the aforementioned application ostensibly to preempt any attempt by Les Schwab to defeat Atkinson's accommodation argument based on the statements Atkinson provided to the Employment Security Department of Washington.

Though somewhat similar, this is not what *Cleveland* requires. Rather, Atkinson was required to explain inconsistencies created by his previous statements that he was fully unable to

work in any capacity and to reconcile those statements with his later claim that his employer failed to reasonably accommodate him. This is the explanation Atkinson failed to address.

Furthermore, a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement. *Cleveland*, 526 U.S. at 806. Atkinson and Atkinson's doctor stated that he was unable to work because of his condition. Atkinson has acted in accordance with those statements since his termination from Les Schwab and has not returned to employment. Atkinson's accommodation claim fails because he has not established the existence of any genuine issue of material fact regarding his ability to perform the essential functions of his former job. Summary judgment was proper on this claim.

RETALIATION

Atkinson next asserts that Rory developed a discriminatory animus towards Atkinson following his 2006 e-mail to Les Schwab's corporate office. Atkinson alleges that Rory took retaliatory action in the form of (1) complaints about Atkinson's disability, (2) overt criticism of Atkinson's work, (3) increasing Atkinson's workload, and (4) undermining Atkinson's authority. Viewing the evidence in a light most favorable to Atkinson, we hold that he failed to produce evidence sufficient to establish the requisite causal link between his participation in statutorily protected activity and the adverse employment action taken against him. Therefore, summary judgment was properly granted in favor of Les Schwab on Atkinson's retaliation claim.

A. RULES OF LAW

The WLAD prohibits retaliation against a party asserting a claim based on a perceived violation of his civil rights or participating in an investigation into alleged workplace discrimination. RCW 49.60.210(1). To establish a prima facie retaliation case, a plaintiff must

show that (1) he engaged in statutorily protected activity, (2) his employer took adverse employment action against him, and (3) there is a causal link between the activity and the adverse action. *Short v. Battle Ground Sch. Dist.*, 169 Wn. App. 188, 205, 279 P.3d 902 (2012). Our focus here is whether Atkinson engaged in statutorily protected activity and if so, whether that activity was causally linked to his demotion.[22]

### B. STATUTORILY PROTECTED CONDUCT

An employee engages in WLAD-protected activity when he opposes employment practices forbidden by antidiscrimination law or other practices that he reasonably believed to be discriminatory. *Short*, 169 Wn. App. at 205. It is not necessary that the conduct complained of actually be unlawful because "'[a]n employee who opposes employment practices reasonably believed to be discriminatory is protected by the opposition clause whether or not the practice is actually discriminatory.'" *Graves v. Dep't of Game*, 76 Wn. App. 705, 712, 887 P.2d 424 (1994) (internal quotation marks omitted) (quoting *Gifford v. Atchison, Topeka & Sante Fe Ry.*, 685 F.2d 1149, 1157 (9th Cir. 1982)). Absent some reference to the plaintiff's protected status, a general complaint about an employer's unfair conduct does not rise to the level of protected activity in a discrimination action under WLAD. *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 315 P.3d 610, 620-21 (2013) (citing *Graves*, 76 Wn. App. at 712)).

Here, Atkinson sent an e-mail to company managers above his local managerial structure because he was concerned about Rory's statement and the implication that Atkinson's condition may be a detriment to his continued mobility. Atkinson was fearful that his disability alone would bar him from future promotion. Refusal to promote an employee because of a disability

---

[22] Because Atkinson was removed from his managerial role, the second element is easily satisfied and not contested by the parties.

would be a violation of WLAD. RCW 49.60.180(3). It is fair to conclude that Atkinson wrote the e-mail in opposition to an employment practice that he reasonably believed would be discriminatory. When the evidence is viewed in a light most favorable to Atkinson as the nonmoving party, his e-mail constitutes protected activity.

## C. CAUSATION

Atkinson must also demonstrate that sending the e-mail and his removal as manager were causally linked. Causation can be inferred from the timing of the adverse action; proximity in time between the adverse action and the protected activity, coupled with the existence of satisfactory work performance and supervisory evaluations suggest an improper motive. *Kahn v. Salerno*, 90 Wn. App. 110, 130-31, 951 P.2d 321, *review denied*, 136 Wn.2d 1016 (1998). Moreover, to show a causal connection, the employee must specifically show that the employer's motivation for the discharge was the employee's exercise or intent to exercise the protected rights. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 68-69, 821 P.2d 18 (1991). The plaintiff need not establish that retaliation for protected activity was the sole reason for the adverse employment action; he must show only that retaliation was a substantial motivating factor. *Allison v. Housing Auth.*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991).

Atkinson fails to establish the causation element. He makes a speculative assertion that Rory wanted to retaliate after Atkinson sent the e-mail because "[Rory] felt like I was going after him." 1 CP at 127. Describing the alleged retaliation, Atkinson states, "[T]here [were] a lot of instances where there was just no leeway," and that "[Rory] would work things in a way that got

23

the crew mad at [him]." 1 CP at 128. Atkinson claims that Rory told employees he was "hiding out" in the bathroom when he was experiencing illness from migraines. 3 CP at 490. Atkinson recounts a specific instance when Rory approved his vacation time off then told the other employees he was upset with Atkinson for being elsewhere during a busy time.

Notwithstanding the fact that Atkinson may have found these behaviors offensive, they do not appear to be connected with his 2006 complaint nor are they adverse employment actions in themselves. Furthermore, there is a striking lack of temporal proximity which tends to indicate that there is no nexus between Atkinson's e-mail and his discharge. *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 863, 991 P.2d 1182, *review denied*, 141 Wn.2d 1017 (2000). The court in *Francom* noted that 15 months had passed between the plaintiff's complaint and an adverse employment action when it declared a connection unlikely. 98 Wn. App. at 863.

Here, nearly three full years passed[23] between Atkinson's 2006 e-mail and his 2009 termination. During this time, Rory supported Atkinson's attempted promotion to store manager. Finally, there was evidence of repeated unsatisfactory performance evaluations before Atkinson's termination. Atkinson fails to establish that his participation in a protected activity was a substantial factor in his termination. Even when viewed in a light most favorable to Atkinson, he fails to establish a prima facie case for retaliation. Summary judgment to Les Schwab on Atkinson's unlawful retaliation claim was properly granted.[24]

---

[23] *See also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (finding that 18 months between complaint and action is too long to give inference of causation).

[24] Atkinson also attempts to advance a hostile work environment claim. We decline to consider this issue because Atkinson did not advance this argument below. A hostile work environment claim does not appear in Atkinson's response to Les Schwab's motion for summary judgment nor does it appear as a cause of action in his complaint. We consider only evidence and issues called to the attention of the trial court. RAP 9.12.

SANCTIONS AND MOTION TO STRIKE

Atkinson appeals the trial court's denial of his second motion for sanctions claiming that he was prejudiced by the inability to obtain necessary discovery. Additionally, Atkinson contends that the trial court erred in striking entire witness declarations instead of only inadmissible portions. We hold that the trial court did not abuse its discretion in refusing to impose additional sanctions nor did it strike Atkinson's witnesses' declarations.

### A. RULES OF LAW

A trial court exercises broad discretion in imposing discovery sanctions under CR 26(g) or 37(b) and its determination will not be disturbed absent a clear abuse of discretion. *Magana v. Hyundai Motor Am.*, 167 Wn.2d 570, 582, 220 P.3d 191 (2009). A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006). "A discretionary decision rests on 'untenable grounds' or is based on 'untenable reasons' if the trial court relies on unsupported facts or applies the wrong legal standard; the court's decision is 'manifestly unreasonable' if 'the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take.'" *Mayer*, 156 Wn.2d at 684 (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 6338 (2003)).

An appellate court reviews all trial court rulings made in conjunction with a summary judgment motion de novo. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

This includes a ruling on a motion to strike evidence. *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 85, 272 P.3d 865, *review denied*, 174 Wn.2d 1016 (2012).

## B. DENIAL OF SECOND MOTION FOR SANCTIONS

Atkinson deposed Stacey Lynch, a human resources manager for Les Schwab. During the first deposition, counsel for Les Schwab instructed Lynch not to respond to the majority of Atkinson's inquiries. In response, Atkinson moved for sanctions, requesting a continuance of the summary judgment hearing, attorney fees, and costs for a second deposition. The trial court granted Atkinson's motion in part.

Still unsatisfied after conducting the second deposition, Atkinson filed a second motion for sanctions to which he also attached declarations from Gerry Arnson, Cohen, and Valissa Holdt. Les Schwab moved to strike these declarations, but the court substantially denied the motion, striking only inadmissible hearsay statements. The trial court also denied Atkinson's second motion for sanctions.

Atkinson's primary contention is that Les Schwab continued to obstruct the discovery process because Lynch answered, "I don't know" to over 100 of his questions during her second deposition. 4 CP at 666. Atkinson asked an array of questions that someone who works in human resources would not be expected to know, including questions concerning stock market investment, Les Schwab's gross revenue, why Les Schwab's chief executive officer is a lawyer, and where he is admitted to practice.[25]

---

[25] Atkinson also fails to cite authority other than the standard of review. We can refuse to consider this argument on these grounds alone. RAP 10.3(a)(5)-(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

The record shows that Lynch made an effort to prepare for questions on topics that pertained to the case and that were reasonably within her knowledge. Furthermore, in making its ruling, the trial court considered the full transcript of Lynch's second deposition. The trial court is in a better position than an appellate court to determine the appropriate discovery sanctions. *Magana*, 167 Wn.2d at 582 n.5. For this reason deference should normally be given to the trial court's decision. *Magana*, 167 Wn.2d at 583 (citing *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)). Given the record, the trial court did not base its decision on untenable or manifestly unreasonable grounds and, therefore, did not abuse its discretion.

## C. MOTION TO STRIKE

Atkinson contends that the trial court abused its discretion in choosing to strike declarations. Atkinson's argument fails. Three declarations were the subject of Les Schwab's motion to strike. The order denying that motion specifically indicates that the declarations will be considered except for those portions that contain inadmissible statements. Moreover, the order granting Les Schwab's motion for summary judgment lists every part of the record that the trial court considered before making its determination. Each one of the declarations which Atkinson claims should not have been struck was, in fact, not struck. The trial court did not err.

No. 44326-1-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, C.J.

LEE, J.

28