# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

IRENE NGUGI, an individual,                )
                                            )   DIVISION ONE
    Appellant/Cross-Respondent,     )
                                            )   No. 72838-5-I
            v.                          )
                                            )   UNPUBLISHED OPINION
WASHINGTON STATE INSTITUTE                  )
FOR PUBLIC POLICY; and                      )
EVERGREEN STATE COLLEGE,                     )
Washington agencies,                        )
                                            )
    Respondents/Cross-Appellants.   )   FILED: April 20, 2015
                                            )

DWYER, J. — Irene Ngugi, a black Kenyan woman, began working as a researcher at the Washington State Institute for Public Policy (the Institute) in 2008. After being terminated from that position in 2010, Ngugi filed suit, claiming, in pertinent part, that her supervisor at the Institute (1) discriminated against her on the basis of her race or national origin, and (2) retaliated against her for formally complaining about the alleged discrimination. The trial court granted summary judgment against Ngugi on both claims. We agree that no reasonable jury could find in Ngugi's favor and affirm the trial court. Because we affirm summary judgment, we decline to reach the issues raised in the Institute's cross-appeal.

I

In late 2007, the Institute, which operated under the auspices of The Evergreen State College (Evergreen) was looking to hire a new research

associate to assist with its work on the Basic Education Finance Task Force. Roxanne Lieb, the Institute's Director, had final hiring authority at the Institute. Lieb and two members of her staff interviewed Ngugi for the position and decided to offer her the job. Lieb was aware that Ngugi was a black woman from Kenya.

Ngugi began her work with the Institute on January 2, 2008. Throughout her employment with the Institute, she was an at-will employee, which was made clear in Ngugi's job offer letter.

Ngugi was not a United States citizen at the time she was hired, and the Institute had to obtain an H-1B[1] work visa in order to employ her. Lieb was aware of this requirement at the time she hired Ngugi. The Institute successfully obtained an H-1B work visa for Ngugi, valid through March 16, 2011. In June 2008, the Institute also decided to sponsor Ngugi's permanent residency application, which was not required in order to continue employing her, as a show of its support for her as an employee. During Ngugi's time with the Institute, the Institute spent over $20,000 on legal fees and costs associated with her immigration status.

The Institute's work was almost wholly dependent upon assignments and funding from the legislature. During 2008, Ngugi worked almost exclusively on the Basic Education Finance Task Force, whose work ended in December 2008. Early in the 2009 legislative session, it became apparent that the Institute would have insufficient assignments and funding from the legislature to continue employing its staff at then-existing levels. In particular, it was clear that the

---

[1] 8 U.S.C. § 1184.

Institute would not be obtaining any assignments or funding for education-related work, which was Ngugi's area of focus.

As a result of the decrease in both funding and new assignments, in early 2009, Lieb notified several employees, including Ngugi, that their employment was at risk of being terminated. Two of these at-risk employees were Caucasian. One of these two opted to retire in early 2009 rather than seek alternative employment. The employment of the other Caucasian employee was ultimately terminated due to the lack of funding. Lieb's early-2009 notification was designed to provide the affected employees with as much warning as possible to allow them to look for alternative employment. Ngugi expressed gratitude to Lieb for giving her this information.[2]

Because she knew that Ngugi was at risk of being let go, Lieb offered to help her find alternative employment and reached out to several employers in the area that she thought might be a good fit for Ngugi. Lieb also tried to help Ngugi develop skills to make her more professionally marketable. For instance, Ngugi had expressed extreme reservations about public speaking and had been reluctant to speak up at group meetings within the Institute. As a result, the Institute paid for Ngugi to join Toastmasters to improve her skills in this area. Lieb and another employee also joined so that Ngugi would be more comfortable attending the meetings. When Ngugi received an award at Toastmasters, Lieb recognized her accomplishments by notifying the Institute's staff. Ngugi

---

[2] "I wanted to thank you for forwarding the job information that you did. It was also very kind of you to inform me about the current work situation. I really appreciate it and all other efforts you have taken on my behalf."

expressed gratitude to Lieb for introducing her to Toastmasters.[3]

Efforts at finding alternative employment for Ngugi initially proved unsuccessful. In March 2009, however, the possibility of Ngugi working on an outside research project with Dr. Dan Goldhaber from the University of Washington arose. Goldhaber intended to pursue outside funding for this project, but for Ngugi to work on the project, the legislature first needed to pass a budget proviso permitting such work. Lieb communicated with her contacts in the legislature in an effort to facilitate this. Ultimately, the proviso was part of the enacted budget. However, before Ngugi and the Institute could begin working on the project, Goldhaber first had to secure funding for the project, as the proviso did not itself provide funding.

On July 16, 2009, Lieb held a pivotal meeting with Ngugi to update her on the status of her employment. Lieb explained that the legislature had not assigned or funded any education-related projects for the Institute but, instead, had directed that work to the Office of the Superintendent of Public Instruction (OSPI). Moreover, Lieb had spoken with Jennifer Priddy, an administrator at OSPI, who was interested in taking Ngugi on loan from the Institute to work on education-related projects at OSPI. Ngugi agreed that the work at OSPI would be a natural fit for her skills.

Also during this meeting, Lieb expressed to Ngugi concerns she had regarding Ngugi's work at the Institute. Lieb explained that, while Ngugi had good skills analyzing data, Lieb was of the opinion that she lacked the skills

---

[3] "Thank you for introducing me to Toastmasters. I think it will be very helpful to me."

necessary to function at a research associate level. That is, while she could mechanically manipulate data, she struggled to see the big picture and the policy implications of the data she was manipulating. Lieb had formed this opinion based on projects she had directly worked on with Ngugi, as well as from feedback from other employees at the Institute.[4] Because it was apparent to Lieb that Ngugi was having difficulty accepting this criticism, Lieb sent Ngugi information regarding the Employee Assistance Program, a free counseling service, the following day.

Ngugi also recalls several specific comments Lieb allegedly made during this conversation. According to Ngugi, Lieb said the following: Ngugi had a good grasp of the English language but had an "edge" to her way of speaking; Ngugi was "too slow"; and "it's not like you're lazy." Lieb also made a comment about Ngugi's "big eyes."

In mid-July 2009, Lieb assigned Ngugi to work on a housing policy paper. According to Lieb, Ngugi's first draft of the paper was wholly inadequate, reading like an advocacy piece that simply collected opinions on the subject, rather than presenting an objective analysis of the relevant research. After receiving this feedback, Ngugi approached Marna Miller, another employee at the Institute, to ask for her assistance on the paper. Miller approached Lieb about this and expressed her desire to mentor Ngugi. Lieb supported and encouraged Miller's efforts in this regard. Miller subsequently spent significant time, often after hours,

---

[4] Priddy later came to the same conclusion regarding Ngugi's skills. ("Ms. Ngugi was a good researcher and I was appreciative of her skills and work attitude, but her research skills did not extend to the policy environment. Ms. Ngugi had limited skills to recognize, formulate, and defend publically the public policy implications of data or research findings.")

mentoring Ngugi on the project.

The proposed loan to OSPI came to fruition in early August 2009. Priddy and Lieb decided that, in order for everyone to determine whether the arrangement was a good fit, Ngugi would first work at OSPI on a trial basis. If it worked out, OSPI would execute a contract with the Institute to reimburse the Institute for Ngugi's time. Waiting to execute a contract also permitted the Institute to see whether the Goldhaber study would be funded, as a decision had not yet been reached at that time and, if funded, the study would consume much of Ngugi's time. Ngugi started her work at OSPI on August 10, 2009.

When Ngugi went to work at OSPI, Lieb e-mailed Miller and urged her to reach out to Ngugi about this opportunity at OSPI in the hope that her so doing would help Ngugi be successful at OSPI.[5]

Initially after moving to OSPI, Ngugi continued working on the housing paper with Miller. As work on the paper progressed, Lieb learned from Miller that Ngugi was having an unusual amount of difficulty with the assignment. In early October 2009, after conferring with Miller about the issue, Lieb decided to have Miller finish the paper alone. From Lieb's perspective, this would allow Ngugi to focus on her work at OSPI, and it would also address the concerns Miller raised about Ngugi's ability to successfully complete the paper.

In late October 2009, the Institute learned that the Goldhaber study would not be funded. Also in late October 2009, OSPI expressed a willingness to

_____

[5] In this e-mail, Lieb stated, "I so want her to be successful there."

execute a formal contract regarding Ngugi.[6] However, given that Ngugi's salary at the Institute was substantially higher than that of OSPI employees engaged in comparable work, OSPI was unable to reimburse the Institute more than $6,257 per month for Ngugi's services. This was less than her then-current salary of $7,206.

On October 28, 2009, Lieb once again spoke to Ngugi regarding the status of her employment with the Institute. Lieb relayed OSPI's interest in contracting for Ngugi's labor, but at a reduced salary, and Ngugi expressed agreement. Lieb also told Ngugi that she would not be working on the Goldhaber study. Additionally, Lieb explained that, although the Institute would continue to support Ngugi's immigration processes, the issue would be revisited in the event of an audit. Ngugi asked Lieb if she would be returning to work at the Institute after her time with OSPI was done, and Lieb told her "no." This was contrary to the impression Ngugi had been given previously, that her placement at OSPI would be temporary. This change was due to both the Institute's continued lack of education-related work and Lieb's concerns about Ngugi's work performance.

After Lieb's October 28, 2009 meeting with Ngugi, Lieb executed a Personnel Action Form (PAF) to effectuate the discussed pay reduction required by the expected contract with OSPI. Lieb then sent the form to Evergreen for finalization.

The only impact that the PAF, once finalized, would have had on the

---

[6] The following e-mail exchange transpired:
Lieb: "Howdy Jennifer, hope this week is better than last in terms of stress level. *I need to make some decisions about Irene*; are you ready to take some type of action?"
Priddy: "Yes, I am ready to do a contract."
(Emphasis added.)

circumstances of Ngugi's employment was to reduce her salary. The form indicated that the pay reduction would be effective from November 1, 2009 through June 30, 2010, the date by which Priddy indicated OSPI would reconsider the circumstances of the arrangement. Nothing in the form, including the reference to June 30, 2010, changed the at-will nature of Ngugi's employment or otherwise promised Ngugi employment for any period of time.

The next day, an attorney representing Ngugi contacted Evergreen and alleged that Ngugi had been discriminated against. This was the first time Ngugi had claimed that the Institute had discriminated against her.

Lieb learned of this development within the next couple of days. Desiring guidance regarding how to handle the situation, Lieb contacted the Attorney General's Office. An assistant attorney general advised Lieb to put the reduction in pay on hold while more details could be learned regarding Ngugi's allegations. Although the reduction in pay had been set into motion prior to any claims of discrimination, Lieb and the Institute's counsel wanted to ensure that there was not even an *appearance* of retaliation.

Pursuant to this legal advice, Lieb successfully took steps to intercept the PAF and prevent the reduction in pay. The only impact this had on Ngugi was to prevent her salary from being reduced. Thus, Ngugi continued working at OSPI at the higher salary figure. In fact, her salary was never reduced for the duration of her employment with the Institute.[7]

Ngugi's discrimination complaint did not stop the Institute and OSPI from

---

[7] During Ngugi's employment with the Institute, she received two pay raises—one raising her salary from $6,125 to $7,025 per month and another raising it from $7,025 to $7,206 per month.

continuing to work toward finalizing a contract to formalize the loan of Ngugi to OSPI. Indeed, Lieb and Priddy continued their efforts in this regard until late November 2009, when legal issues arose that precluded a contract from being executed.

At that time, immigration attorneys assisting the Institute and OSPI opined that the proposed contract likely would not comply with immigration laws. These laws prohibit one employer from hiring a worker using an H-1B work visa and then loaning that worker out to a different employer.[8] For such an arrangement to be appropriate, the employer holding the H-1B visa needed to maintain a supervisory relationship with the worker. This would not have been the case if Ngugi had continued to work on loan to OSPI.

Moreover, advice from these attorneys also led OSPI to conclude that it was unable to hire Ngugi directly for the position in which she had been working. To employ a worker under an H-1B visa, an employer must be able to represent to immigration officials that the worker has skills that the employer cannot otherwise find in the work force. Based on the nature of the work Ngugi was performing for OSPI, Priddy did not believe that OSPI could make such a representation.

At that point, OSPI could neither take Ngugi "on loan" from the Institute nor hire her directly for the work she was currently performing. As a result, the Institute decided to end Ngugi's employment. On December 4, 2009, Lieb notified Ngugi that her employment with the Institute would end on December 31,

---

[8] Indeed, the approval notice for Ngugi's H-1B visa stated: "The foreign worker(s) can work for the petitioner, but only as detailed in the petition and for the period authorized. Any change in employment requires a new petition."

2009. While the Institute could have discharged Ngugi immediately, Lieb decided to give Ngugi roughly a month's notice in order to allow her time to find alternative employment or otherwise change her immigration status so she could remain in the country.

After learning about Ngugi's situation, another administrator at OSPI, Robin Munson, decided to offer a different position directly to Ngugi. Munson had experienced difficulty filling the position at issue and, thus, felt she could make the necessary representations regarding the need to employ Ngugi under an H-1B visa. The position, however, was at a lower level than the one OSPI had originally intended for Ngugi to fill and had a correspondingly lower annual salary of $50,000. OSPI formally offered the position to Ngugi on December 16, 2009.

Although Ngugi did not immediately accept this offer, OSPI spent a significant amount of time and effort working through the immigration issues associated with her visa. However, on December 22, 2009, before Ngugi had communicated to OSPI whether she would accept the lower-paying position, the annual cap on the number of H-1B visas that the federal government could award that year was met.

While this meant that OSPI could not immediately seek a new H-1B visa for Ngugi, it could still have sought to transfer her existing visa from the Institute to OSPI, and she could have worked for OSPI as soon as the transfer application

had been filed by OSPI.[9] Due to this complication, though, OSPI could not employ Ngugi in the new position until the first week of January 2010 at the earliest. This posed a problem because Ngugi's employment with the Institute was scheduled to end December 31, 2009. To prevent any lapses in Ngugi's employment, which might have led to her deportation, Lieb agreed to extend the effective date of Ngugi's discharge to January 8, 2010. In the end, however, Ngugi turned down the OSPI position.

Ngugi's employment with the Institute thus ended on January 8, 2010. Because the Institute and OSPI were never able to execute a contract regarding Ngugi's work, the Institute was never reimbursed for the more than $35,000 in salary it had paid to Ngugi while she worked at OSPI.

Ngugi filed this lawsuit on January 27, 2012, bringing claims for race and national origin discrimination, hostile work environment, disparate treatment, retaliation, negligent infliction of emotional distress, tortious interference with business expectancy, and unpaid wages and willfully withheld wages. On August 2, 2013, the trial court dismissed all of Ngugi's claims with prejudice on summary judgment. Ngugi now appeals the summary dismissal of only her race and national origin discrimination and retaliation claims.

In addition to its motion for summary judgment, the Institute[10] also filed a motion to strike various materials submitted by Ngugi with her summary

---

[9] 8 U.S.C. §1184(n) (1) ("Increased portability of H-1B status[.] . . . A nonimmigrant alien described in paragraph (2) who was previously issued a[n] [H-1B] visa . . . is authorized to accept new employment upon the filing by the prospective employer of a new petition on behalf of such nonimmigrant as provided under subsection (a) of this section. Employment authorization shall continue for such alien until the new petition is adjudicated.").

[10] For ease, we refer to the combined respondents/cross-appellants as the "Institute."

judgment opposition pleadings. The trial court recognized that the materials the Institute moved to strike had "problematic admissibility issues," and criticized Ngugi's handling of these materials. Nevertheless, the court declined to rule on the Institute's motion to strike given that it was granting its summary judgment motion.

II

Ngugi first contends that the trial court improperly granted summary judgment in favor of the Institute with respect to her disparate treatment claim. This is so, she asserts, because she presented sufficient evidence that the Institute acted with a discriminatory purpose in taking adverse employment actions against her. We disagree.

We review a trial court's grant of summary judgment de novo. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Camicia, 179 Wn.2d at 693. When making this determination, we consider all facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

Under Washington's Law Against Discrimination (WLAD), it is an unfair practice for an employer to refuse to hire any person on the basis of a protected characteristic, including race and national origin. RCW 49.60.180. "At trial, the WLAD plaintiff must ultimately prove that [the protected characteristic] was a

'substantial factor' in an employer's adverse employment action." <u>Scrivener v. Clark Coll.</u>, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). A "substantial factor" means that the protected characteristic was a significant motivating factor bringing about the employer's decision, not that the protected characteristic was the sole factor in the decision. <u>Scrivener</u>, 181 Wn.2d at 444.

"[S]ummary judgment to an employer is seldom appropriate in the WLAD cases." <u>Scrivener</u>, 181 Wn.2d at 445. To overcome summary judgment, a plaintiff needs to show only "that *a reasonable jury could find* that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions." <u>Scrivener</u>, 181 Wn.2d at 445 (emphasis added). "This is a burden of production, not persuasion, and may be proved through direct or circumstantial evidence." <u>Riehl v. Foodmaker, Inc.</u>, 152 Wn.2d 138, 149, 94 P.3d 930 (2004).

Where a WLAD plaintiff lacks direct evidence of discrimination, we use the burden-shifting analysis articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to determine the proper order and nature of proof for summary judgment.[11] The recent Washington Supreme Court case <u>Scrivener v. Clark College</u> well-elucidates this analysis:

> Under the first prong of the <u>McDonnell Douglas</u> framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a presumption of discrimination. <u>Riehl</u>, 152 Wn.2d at 149-50; <u>Kastanis v. Educ. Emps. Credit Union</u>, 122 Wn.2d 483, 490, 859 P.2d 26, 865 P.2d 507 (1993). Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory

---

[11] Because the WLAD is patterned after Title 7 of the Civil Rights Act of 1964, 42 U.S.C. 2000(e), Washington courts rely on federal decisions interpreting Title 7 to decide issues under the WLAD. <u>See, e.g.</u>, <u>Oliver v. Pac. Nw. Bell Tel. Co.</u>, 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); <u>Haubry v. Snow</u>, 106 Wn. App. 666, 674 n.7, 31 P.3d 1186 (2001).

reason for the adverse employment action. <u>Grimwood v. Univ. of Puget Sound, Inc.</u>, 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988).

"If the Defendant meets this burden, the third prong of the <u>McDonnell Douglas</u> test requires the Plaintiff to produce sufficient evidence that Defendant's alleged nondiscriminatory reason for [the employment action] was a pretext." <u>Hume[ v. Am. Disposal Co.]</u>, 124 Wn.2d [656,] 667[, 880 P.2d 988 (1994)]. Evidence is sufficient to overcome summary judgment if it creates a genuine issue of material fact that the employer's articulated reason was a pretext for a discriminatory purpose. <u>Id.</u> at 668; <u>Grimwood</u>, 110 Wn.2d at 364; <u>Riehl</u>, 152 Wn.2d at 150.

. . . .

. . . An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. <u>Fell v. Spokane Transit Auth.</u>, 128 Wn.2d 618, 643 n.32, 911 P.2d 1319 (1996); <u>see</u> <u>Wilmot v. Kaiser Alum. & Chem. Corp.</u>, 118 Wn.2d 46, 73, 821 P.2d 18 (1991); <u>Grimwood</u>, 110 Wn.2d at 365.

An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor. <u>See</u> <u>Mackay[ v. Acorn Custom Cabinetry, Inc.]</u>, 127 Wn.2d [302,] 309-11[, 898 P.2d 284 (1995)]. An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD. <u>See</u> <u>id.</u>

<u>Scrivener</u>, 181 Wn.2d at 446-47.

"If the plaintiff satisfies the <u>McDonnell Douglas</u> burden of production requirements, the case proceeds to trial, unless the judge determines that no rational fact finder could conclude that the action was discriminatory." <u>Scrivener</u>, 181 Wn.2d at 446.

When someone is both hired and fired by the same decision-maker within a relatively short period of time, the "same actor" or "same decision maker" inference applies; that is, "there is a strong inference that he or she was *not* discharged because of any attribute the decision makers were aware of at the time of hiring." Hill v. BCTI Income Fund–I, 144 Wn.2d 172, 189, 189, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 137 P.3d 844 (2006); accord Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir.1996) ("[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."). "For a plaintiff to prevail under such circumstances, the evidence must answer an obvious question: if the employer is opposed to employing persons with a certain attribute, why would the employer have hired such a person in the first place?" Hill, 144 Wn.2d at 189-90.

To establish a prima facie case of disparate treatment, a plaintiff must show that (1) he or she belongs to a protected class, (2) he or she was treated less favorably in the terms or conditions of her employment than a similarly situated, nonprotected employee, and (3) he or she and the nonprotected "comparator" were doing substantially similar work.[12] Washington v. Boeing Co., 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).

"The burden of establishing a prima facie case of disparate treatment is not onerous." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.

---

[12] The elements for a prima facie case are not absolute but vary based on the relevant facts. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); McDonnell Douglas, 411 U.S. at 802 n.13; Grimwood, 110 Wn.2d at 363-64.

Ct. 1089, 67 L.Ed.2d 207 (1981). "The 'requisite degree of proof necessary to establish a prima facie case . . . is *minimal* and does not even need to rise to the level of a preponderance of the evidence.'" Fulton v. Dep't of Social & Health Servs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012) (alteration in original) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994)).

There is no real dispute as to the first and third aspects of Ngugi's prima facie case. As to the second aspect, Ngugi alleges in her declaration that the following adverse employment actions were taken against her: she, unlike other employees, was offered no systematic feedback, training, or mentoring, she was given fewer assignments than others, she was not invited to staff meetings, her relationships with other researchers were discouraged, and she was eventually terminated from her position. Ngugi established a prima facie case of disparate treatment.

Thus, the burden of production shifts to the Institute to articulate a legitimate, nondiscriminatory reason for each adverse employment action. With regard to feedback, the Institute presented evidence that it did not begin giving its employees formal evaluations until 2010, after Ngugi had been terminated. This is significant because, in her own declaration, Ngugi acknowledges receiving informal feedback intermittently during her time at the Institute. Ngugi's allegation that, beginning in early 2009, after work on the Basic Education Finance Task Force ended, she was given fewer assignments is entirely consistent with evidence presented by the Institute that, at about that time, it became clear that the Institute would receive less funding and fewer assignments

from the legislature, particularly education-related ones. Moreover, the parties agree that Lieb communicated this information to Ngugi soon thereafter. Regarding staff meetings, the Institute presented evidence that, before she began working at OSPI, Ngugi was invited to every Institute staff meeting. This evidence is consistent with Ngugi's allegation that she was not invited to a meeting sometime after July 2009. Additionally, the Institute presented significant evidence contrary to Ngugi's allegation that Lieb had discouraged her relationships with other Institute researchers, including an e-mail from Lieb asking Miller to reach out to Ngugi and support her in her transition to the position at OSPI. As to why Ngugi was terminated, the Institute presented evidence that Ngugi was at risk of being terminated beginning in early 2009, that Lieb, knowing this, had tried to find Ngugi alternative employment, that the arrangement with OSPI had shown the most promise, that, due to complications related to Ngugi's immigration status, the OSPI arrangement fell through, and that only then was Ngugi let go.

Finally, the Institute presented significant evidence of nondiscriminatory conduct toward Ngugi, including: (1) hiring her, (2) twice raising her salary, (3) sponsoring her for permanent residency, (4) spending over $ 20,000 on attorney fees to support her work visa and permanent residency applications, (5) actively seeking alternative employment opportunities for her after determining that the Institute could not continue employing her, (6) paying for her to attend Toastmasters to help her be more marketable, (7) employees attending Toastmasters meetings with her to make her more comfortable, (8) urging the

legislature to include in its budget a proviso for a project that would allow the Institute to continue employing her, (9) paying her over $35,000 while she worked at OSPI when there was insufficient work at the Institute for her, (10) attempting to secure a contract with OSPI that would permit her to work at OSPI without jeopardizing her immigration status, and (11) extending her termination date by a week to avoid jeopardizing her immigration status.

Because the Institute articulated legitimate reasons for its actions, the burden shifts back to Ngugi to offer sufficient evidence that the proffered nondiscriminatory reasons were pretexts. In addition to alleging that only she was subjected to the adverse employment actions detailed above, Ngugi offers the comments Lieb made to her during their July 16, 2009 meeting as evidence of pretext. Specifically, as to Lieb's comment about Ngugi's "big eyes," Ngugi asserts that, "such a portrayal of frightened black people with 'wide eyes' is consistent with the historic portrayal of blacks' anthropromorphic [sic] features to a white audience." Appellant's Br. at 35. Ngugi also references Lieb's comments about Ngugi not being lazy and speaking with an "edge" as examples of Lieb using "stereotypical, offensive personal language about Ngugi." Appellant's Reply Br. at 6.

As set forth above, to overcome summary judgment, Ngugi must establish that the Institute took adverse employment action against her and that her race or national origin was a significant factor motivating that action. Moreover, because this claim is subject to the same actor inference, she must suggest an

answer as to why, if the Institute is opposed to employing persons of a certain race or national origin, the Institute hired her in the first place.

The Institute presented significant evidence of both legitimate reasons for the adverse employment actions alleged by Ngugi and nondiscrimination. By contrast, Ngugi presented very little evidence suggesting pretext and she does not even suggest an answer to the same decision-maker inference. No reasonable jury could find for Ngugi on this evidence. Therefore, Ngugi did not meet her burden and summary judgment was properly granted in the Institute's favor.

### III

Ngugi next contends that the Institute unlawfully retaliated against her. This is so, she asserts, because the Institute took adverse action against her in response to her discrimination complaints. We disagree.

The WLAD prohibits retaliation against a person for opposing practices forbidden by the act. RCW 49.60.210(1). RCW 49.60.210(1) states, in pertinent part, "It is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." The same McDonnell Douglas burden-shifting protocol applies to a claim for retaliation.[13] Hill, 144 Wn.2d at 180.

---

[13] For the first time on appeal, Ngugi suggests that her retaliation claim is based not only on circumstantial evidence, but also on direct evidence. Addressing this issue would require conducting a different analysis than that set forth in McDonnell-Douglas, see Hegwine v. Longview Fibre Co., 162 Wn.2d 340, 172 P.3d 688 (2007), no part of which was called to the attention of the trial court. We decline to address this issue. RAP 2.5(a); RAP 9.12.

However, the "same actor" inference does not apply with respect to retaliation claims.[14]

To establish a prima facie case of retaliation, a plaintiff must show that (1) he or she engaged in statutorily protected activity, (2) his or her employer took some adverse employment action against him or her, and (3) there is a causal link between the employee's activity and the employer's adverse action. Estevez v. Faculty Club of Univ. of Wash., 129 Wn. App. 774, 797, 120 P.3d 579 (2005).

An employee engages in WLAD-protected activity when the employee opposes employment practices forbidden by antidiscrimination law or other practices that are reasonably believed to be discriminatory. Short v. Battle Ground Sch. Dist., 169 Wn. App. 188, 205, 279 P.3d 902 (2012). The plaintiff need not show that retaliation was the only or "but for" cause of the adverse employment action. Allison v. Hous. Auth. of Seattle, 118 Wn.2d 79, 95-96, 821 P.2d 34 (1991). However, the plaintiff must show that retaliation was at least a "substantial factor" in the employer's decision to take adverse action. Allison, 118 Wn.2d at 95.

Ngugi makes out a prima facie case of discrimination. The record establishes that Ngugi began the process of filing a formal discrimination

---

[14] We have previously explained why the inference does not apply to retaliations claims. [W]ithout the inference in discrimination cases, "employers could be discouraged from hiring the very persons the Legislature intended the Law Against Discrimination to protect, fearful that doing so would make them more vulnerable, rather than less, to legal claims of unlawful discriminatory animus if legitimate business reasons later required discharging such a person." [Hill, 144 Wn.2d] at 190 n.13. Similar policy concerns are not present [in the retaliation context]. Refusing to adopt the same actor inference in retaliation claims would not make the employer more vulnerable to such claims. Rather, adopting this inference would allow an employer to grant a raise or promotion prior to implementing a termination as a means of decreasing their exposure to a valid retaliation claim. Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 853, 292 P.3d 779 (2013).

complaint with Evergreen on October 29, 2009. Additionally, it is undisputed that Institute staff was made aware of this complaint within days and that, soon thereafter, Ngugi was terminated.[15]

Ngugi also alleges that a contract guaranteeing her employment at OSPI through June 2010 was destroyed in retaliation for her discrimination complaint. However, Ngugi proffers no evidence of this contract. It is true that the Institute intercepted the PAF and prevented it from taking effect but, as the only effect of this action was to prevent Ngugi's pay from being cut, this cannot constitute an adverse employment action. Ngugi's retaliation claim cannot rest on the mere allegations that another contract existed, that the purported contract guaranteed Ngugi's employment at OSPI for a fixed term, and that the Institute destroyed it. See CR 56(e).[16]

The Institute also successfully articulates a legitimate, nonretaliatory reason for the adverse employment action. The Institute offers the same explanation as above as to why Ngugi was terminated. Specifically, the Institute presented evidence that Ngugi was finally terminated in December 2009, after months of warning that her employment was at risk, because the Institute

---

[15] See Kahn v. Salerno, 90 Wn. App. 110, 131, 951 P.2d 321 (1998) ("[I]f the employee establishes that he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case.").

[16] Ngugi also asserts that she was removed as the primary author on the housing paper in retaliation for her discrimination complaint. However, there is significant evidence in the record to the contrary. Specifically, the record establishes that, on October 7, 2009, Ngugi was told that she would no longer work on the housing project and that Miller alone would complete the analysis and writing and present the paper to the legislature. Moreover, shortly before that, Ngugi had been informed that significant work still needed to be done on the project. While Ngugi may have been genuinely surprised to find that she was not the paper's lead author, there can be no question that this eventuality was set in motion weeks before Ngugi made her discrimination complaint.

became aware in November 2009 that, due to limitations imposed by Ngugi's H-1B visa, she could no longer work "on loan" to OSPI.[17]

The Institute also offers evidence of nonretaliation, including that, even after Ngugi made her discrimination complaint, the Institute (1) continued to work to secure a contract with OSPI that would permit her to work there without jeopardizing her immigration status, (2) set Ngugi's termination date to give her roughly a month to find alternative employment or otherwise change her immigration status, and (3) extended Ngugi's termination date to avoid jeopardizing her immigration status.

Thus, the burden shifts back to Ngugi to present evidence of pretext. The only additional evidence of pretext Ngugi offers is that, on December 22, 2009, the annual cap on H-1B visas that the federal government could award that year was reached. Ngugi alleges that, from this fact, there is an inference that her termination was timed to sabotage her immigration status by making it difficult for her to obtain a new visa. As Ngugi presented no evidence that Lieb—or anyone else at the Institute—was aware of this cap or could have anticipated when it would be met, this is not evidence but, rather, is pure speculation.[18] Moreover,

---

[17] The existence of this immigration circumstance is reinforced by the Declaration of Bart Stroupe, an immigration law expert offered by Ngugi. ("The evidence suggests that WSIPP was not aware initially that the assignment of Ms. Ngugi to OSPI was in violation of her H-1 B status. This is indicated in the WSIPP's e-mail forwarded to Nicole Ack on October 28, 2009, in which WSIPP confirmed that they did not believe there was an issue with the arrangement. Subsequently, in November 2009, it appears that WSIPP became aware they were required to either amend Ngugi's H1-B petition or have OSPI apply a new H1-B visa.").

[18] See Grimwood, 110 Wn.2d at 359-60 ("A fact is an event, an occurrence, or something that exists in reality. Webster's Third New Int'l Dictionary 813 (1976). It is what took place, an act, an incident, a reality as distinguished from supposition or opinion. 35 C.J.S. Fact 489 (1960). The "facts" required by CR 56(e) to defeat a summary judgment motion are evidentiary in nature. Ultimate facts or conclusions of fact are insufficient. See Hatch v. Bush, 215 Cal. App. 2d 692, 30 Cal. Rptr. 397 (1963). Likewise, conclusory statements of fact

there is overwhelming evidence in the record that Lieb was concerned with protecting Ngugi's immigration status, not sabotaging it.

Here too, the Institute presented significant evidence not only of legitimate reasons for the adverse employment action, but also of nonretaliation by the Institute. Once again, Ngugi, by contrast, presented relatively little evidence of retaliatory motive. No reasonable jury could find for Ngugi on this evidence. Therefore, Ngugi did not meet her burden and summary judgment in the Institute's favor was proper.

IV

On review of an order granting or denying a motion for summary judgment, our primary purpose is to engage in the same inquiry as the trial court. RAP 9.12; see also Mithoug v. Apollo Radio of Spokane, 128 Wn.2d 460, 462, 909 P.2d 291 (1996) ("'The purpose of [RAP 9.12] is to effectuate the rule that the appellate court engages in the same inquiry as the trial court.'" (quoting Wash. Fed'n of State Emps. v. Office of Fin. Mgmt., 121 Wn.2d 152, 157, 849 P.2d 1201 (1993))). Moreover, "'[p]rinciples of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'" Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 68, 1 P.3d 1167 (2000) (internal quotation marks omitted) (quoting State v. Peterson, 133 Wn.2d 885, 894, 948 P.2d 381 (1997) (Talmadge, J. concurring)). For these reasons, because the foregoing analysis effectively disposes of this case, we decline to

---

will not suffice. American Linen Supply Co. v. Nursing Home Bldg. Corp., 15 Wn. App. 757, 767, 551 P.2d 1038 (1976).").

address the bulk of the issues raised by the Institute in its cross-appeal. However, we choose to address one issue raised in order to clarify the applicability of law not cited to us by either party.

The Institute contends that the trial court erred in not striking the declaration of Bart Stroupe, an immigration law expert. This is so, it asserts, because Ngugi failed to disclose Stroupe's identity in her witness disclosures and discovery responses. By way of appellate relief, the Institute seeks for *us* to exclude the declaration (the summary judgment equivalent of a witness being excluded at trial).

"A trial court's discretion to exclude witnesses is cabined by this court's holdings in Burnet[ v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997),] and its progeny." Jones v. City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013). Before imposing "'one of the harsher remedies allowable under CR 37(b),'" the trial court must explicitly consider (1) whether a lesser sanction would probably suffice, (2) whether the violation at issue was willful or deliberate, and (3) whether the violation substantially prejudiced the opponent's ability to prepare for trial. Burnet, 131 Wn.2d at 494 (quoting Snedigar v. Hodderson, 53 Wn. App. 476, 487, 768 P.2d 1 (1989)), aff'd in relevant part, 114 Wn.2d 153, 169, n.37, 786 P.2d 781 (1990). Witness exclusion is a severe sanction to which Burnet applies. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 690, 132 P.3d 115 (2006). An appellate court cannot consider the facts in the first instance as a substitute for the trial court findings that precedent requires. Blair v. TA-Seattle E. No. 176, 171 Wn.2d 342, 351, 254 P.3d 797 (2011).

The Institute seeks relief from this court without mentioning Burnet or its progeny, just as it failed to bring these authorities to the attention of the trial court. The Institute's requested relief—the exclusion of Ngugi's witness—may only be granted after the trial court explicitly considers the required issues and makes a record of its findings. We may not consider these issues in the first instance. Blair, 171 Wn.2d at 351. Because the trial court was not requested to conduct the necessary analysis, and did not do so of its own volition, the Institute is precluded from seeking the relief it requests.

V

The Institute filed with this court a lengthy motion to strike portions of Ngugi's appellate briefs. We have previously made clear our view of such motions:

> [The Institute] could have addressed this issue in [its] reply brief in a few sentences rather than filing a separate motion to strike. This course would have saved time and resources of the parties and the court without diminishing the quality of the decision-making process.

In re Marriage of Rostrom, 184 Wn. App. 744, 764, 339 P.3d 185 (2014).

We deny the motion.

Affirmed.

We concur:

- 25 -